## GRISWOLD ET AL. *v.* CONNECTICUT.

No. 496.  Argued March 29–30, 1965.—Decided June 7, 1965.

*Thomas I. Emerson* argued the cause for appellants. With him on the briefs was *Catherine G. Roraback.*

*Joseph B. Clark* argued the cause for appellee.  With him on the brief was *Julius Maretz.*

Briefs of *amici curiae,* urging reversal, were filed by *Whitney North Seymour* and *Eleanor M. Fox* for Dr. John M. Adams et al.; by *Morris L. Ernst, Harriet F. Pilpel* and *Nancy F. Wechsler* for the Planned Parenthood Federation of America, Inc.; by *Alfred L. Scanlon* for the Catholic Council on Civil Liberties, and by *Rhoda H. Karpatkin, Melvin L. Wulf* and *Jerome E. Caplan* for the American Civil Liberties Union et al.

Mr. Justice Douglas delivered the opinion of the Court.

Appellant Griswold is Executive Director of the Planned Parenthood League of Connecticut. Appellant Buxton is a licensed physician and a professor at the Yale Medical School who served as Medical Director for the League at its Center in New Haven—a center open and operating from November 1 to November 10, 1961, when appellants were arrested.

They gave information, instruction, and medical advice to *married persons* as to the means of preventing conception. They examined the wife and prescribed the best contraceptive device or material for her use. Fees were usually charged, although some couples were serviced free.

The statutes whose constitutionality is involved in this appeal are §§ 53–32 and 54–196 of the General Statutes of Connecticut (1958 rev.). The former provides:

"Any person who uses any drug, medicinal article or instrument for the purpose of preventing conception shall be fined not less than fifty dollars or imprisoned not less than sixty days nor more than one year or be both fined and imprisoned."

Section 54–196 provides:

"Any person who assists, abets, counsels, causes, hires or commands another to commit any offense may be prosecuted and punished as if he were the principal offender."

The appellants were found guilty as accessories and fined $100 each, against the claim that the accessory statute as so applied violated the Fourteenth Amendment. The Appellate Division of the Circuit Court affirmed. The Supreme Court of Errors affirmed that judgment. 151 Conn. 544, 200 A. 2d 479. We noted probable jurisdiction. 379 U. S. 926.

We think that appellants have standing to raise the constitutional rights of the married people with whom they had a professional relationship. *Tileston* v. *Ullman,* 318 U. S. 44, is different, for there the plaintiff seeking to represent others asked for a declaratory judgment. In that situation we thought that the requirements of standing should be strict, lest the standards of "case or controversy" in Article III of the Constitution become blurred. Here those doubts are removed by reason of a criminal conviction for serving married couples in violation of an aiding-and-abetting statute. Certainly the accessory should have standing to assert that the offense which he is charged with assisting is not, or cannot constitutionally be, a crime.

This case is more akin to *Truax* v. *Raich,* 239 U. S. 33, where an employee was permitted to assert the rights of his employer; to *Pierce* v. *Society of Sisters,* 268 U. S. 510, where the owners of private schools were entitled to assert the rights of potential pupils and their parents; and to *Barrows* v. *Jackson,* 346 U. S. 249, where a white defendant, party to a racially restrictive covenant, who was being sued for damages by the covenantors because she had conveyed her property to Negroes, was allowed to raise the issue that enforcement of the covenant violated the rights of prospective Negro purchasers to equal protection, although no Negro was a party to the suit. And see *Meyer* v. *Nebraska,* 262 U. S. 390; *Adler* v. *Board of Education,* 342 U. S. 485; *NAACP* v. *Alabama,* 357 U. S. 449; *NAACP* v. *Button,* 371 U. S. 415. The rights of husband and wife, pressed here, are likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to them.

Coming to the merits, we are met with a wide range of questions that implicate the Due Process Clause of the Fourteenth Amendment. Overtones of some arguments

suggest that *Lochner* v. *New York,* 198 U. S. 45, should be our guide. But we decline that invitation as we did in *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; *Olsen* v. *Nebraska,* 313 U. S. 236; *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525; *Williamson* v. *Lee Optical Co.,* 348 U. S. 483; *Giboney* v. *Empire Storage Co.,* 336 U. S. 490. We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions. This law, however, operates directly on an intimate relation of husband and wife and their physician's role in one aspect of that relation.

The association of people is not mentioned in the Constitution nor in the Bill of Rights. The right to educate a child in a school of the parents' choice—whether public or private or parochial—is also not mentioned. Nor is the right to study any particular subject or any foreign language. Yet the First Amendment has been construed to include certain of those rights.

By *Pierce* v. *Society of Sisters, supra,* the right to educate one's children as one chooses is made applicable to the States by the force of the First and Fourteenth Amendments. By *Meyer* v. *Nebraska, supra,* the same dignity is given the right to study the German language in a private school. In other words, the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (*Martin* v. *Struthers,* 319 U. S. 141, 143) and freedom of inquiry, freedom of thought, and freedom to teach (see *Wieman* v. *Updegraff,* 344 U. S. 183, 195)—indeed the freedom of the entire university community. *Sweezy* v. *New Hampshire,* 354 U. S. 234, 249–250, 261–263; *Barenblatt* v. *United States,* 360 U. S. 109, 112; *Baggett* v. *Bullitt,* 377 U. S. 360, 369. Without

those peripheral rights the specific rights would be less secure. And so we reaffirm the principle of the *Pierce* and the *Meyer* cases.

In *NAACP* v. *Alabama,* 357 U. S. 449, 462, we protected the "freedom to associate and privacy in one's associations," noting that freedom of association was a peripheral First Amendment right. Disclosure of membership lists of a constitutionally valid association, we held, was invalid "as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association." *Ibid.* In other words, the First Amendment has a penumbra where privacy is protected from governmental intrusion. In like context, we have protected forms of "association" that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members. *NAACP* v. *Button,* 371 U. S. 415, 430–431. In *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, we held it not permissible to bar a lawyer from practice, because he had once been a member of the Communist Party. The man's "association with that Party" was not shown to be "anything more than a political faith in a political party" (*id.,* at 244) and was not action of a kind proving bad moral character. *Id.,* at 245–246.

Those cases involved more than the "right of assembly"—a right that extends to all irrespective of their race or ideology. *De Jonge* v. *Oregon,* 299 U. S. 353. The right of "association," like the right of belief (*Board of Education* v. *Barnette,* 319 U. S. 624), is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful.

The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. See *Poe* v. *Ullman,* 367 U. S. 497, 516–522 (dissenting opinion). Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment in its prohibition against the quartering of soldiers "in any house" in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

The Fourth and Fifth Amendments were described in *Boyd* v. *United States,* 116 U. S. 616, 630, as protection against all governmental invasions "of the sanctity of a man's home and the privacies of life."* We recently re-

---

*The Court said in full about this right of privacy:

"The principles laid down in this opinion [by Lord Camden in *Entick* v. *Carrington,* 19 How. St. Tr. 1029] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of

ferred in *Mapp* v. *Ohio,* 367 U. S. 643, 656, to the Fourth Amendment as creating a "right to privacy, no less important than any other right carefully and particularly reserved to the people." See Beaney, The Constitutional Right to Privacy, 1962 Sup. Ct. Rev. 212; Griswold, The Right to be Let Alone, 55 Nw. U. L. Rev. 216 (1960).

We have had many controversies over these penumbral rights of "privacy and repose." See, *e. g., Breard* v. *Alexandria,* 341 U. S. 622, 626, 644; *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451; *Monroe* v. *Pape,* 365 U. S. 167; *Lanza* v. *New York,* 370 U. S. 139; *Frank* v. *Maryland,* 359 U. S. 360; *Skinner* v. *Oklahoma,* 316 U. S. 535, 541. These cases bear witness that the right of privacy which presses for recognition here is a legitimate one.

The present case, then, concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. And it concerns a law which, in forbidding the *use* of contraceptives rather than regulating their manufacture or sale, seeks to achieve its goals by means having a maximum destructive impact upon that relationship. Such a law cannot stand in light of the familiar principle, so often applied by this Court, that a "governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP* v. *Alabama,* 377 U. S. 288, 307. Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The

Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other." 116 U. S., at 630.

very idea is repulsive to the notions of privacy surrounding the marriage relationship.

We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

*Reversed.*

MR. JUSTICE GOLDBERG, whom THE CHIEF JUSTICE and MR. JUSTICE BRENNAN join, concurring.

I agree with the Court that Connecticut's birth-control law unconstitutionally intrudes upon the right of marital privacy, and I join in its opinion and judgment. Although I have not accepted the view that "due process" as used in the Fourteenth Amendment incorporates all of the first eight Amendments (see my concurring opinion in *Pointer* v. *Texas,* 380 U. S. 400, 410, and the dissenting opinion of MR. JUSTICE BRENNAN in *Cohen* v. *Hurley,* 366 U. S. 117, 154), I do agree that the concept of liberty protects those personal rights that are fundamental, and is not confined to the specific terms of the Bill of Rights. My conclusion that the concept of liberty is not so restricted and that it embraces the right of marital privacy though that right is not mentioned explicitly in the Constitution [1] is supported both by numer-

---

[1] My Brother STEWART dissents on the ground that he "can find no . . . general right of privacy in the Bill of Rights, in any other part of the Constitution, or in any case ever before decided by this Court." *Post,* at 530. He would require a more explicit guarantee than the one which the Court derives from several constitutional amendments. This Court, however, has never held that the Bill of Rights or the

ous decisions of this Court, referred to in the Court's opinion, and by the language and history of the Ninth Amendment. In reaching the conclusion that the right of marital privacy is protected, as being within the protected penumbra of specific guarantees of the Bill of Rights, the Court refers to the Ninth Amendment, *ante,* at 484. I add these words to emphasize the relevance of that Amendment to the Court's holding.

The Court stated many years ago that the Due Process Clause protects those liberties that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder* v. *Massachusetts,* 291 U. S. 97, 105. In *Gitlow* v. *New York,* 268 U. S. 652, 666, the Court said:

> "For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the *fundamental* personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." (Emphasis added.)

Fourteenth Amendment protects only those rights that the Constitution specifically mentions by name. See, *e. g., Bolling* v. *Sharpe,* 347 U. S. 497; *Aptheker* v. *Secretary of State,* 378 U. S. 500; *Kent* v. *Dulles,* 357 U. S. 116; *Carrington* v. *Rash,* 380 U. S. 89, 96; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232; *NAACP* v. *Alabama,* 360 U. S. 240; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Meyer* v. *Nebraska,* 262 U. S. 390. To the contrary, this Court, for example, in *Bolling* v. *Sharpe, supra,* while recognizing that the Fifth Amendment does not contain the "explicit safeguard" of an equal protection clause, *id.,* at 499, nevertheless derived an equal protection principle from that Amendment's Due Process Clause. And in *Schware* v. *Board of Bar Examiners, supra,* the Court held that the Fourteenth Amendment protects from arbitrary state action the right to pursue an occupation, such as the practice of law.

And, in *Meyer* v. *Nebraska,* 262 U. S. 390, 399, the Court, referring to the Fourteenth Amendment, stated:

> "While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also [for example,] the right . . . to marry, establish a home and bring up children . . . ."

This Court, in a series of decisions, has held that the Fourteenth Amendment absorbs and applies to the States those specifics of the first eight amendments which express fundamental personal rights.[2] The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments.

The Ninth Amendment reads, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The Amendment is almost entirely the work of James Madison. It was introduced in Congress by him and passed the House and Senate with little or no debate and virtually no change in language. It was proffered to quiet expressed fears that a bill of specifically enumerated rights[3] could not be sufficiently broad to cover all es-

---

[2] See, *e. g., Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226; *Gitlow* v. *New York, supra; Cantwell* v. *Connecticut,* 310 U. S. 296; *Wolf* v. *Colorado,* 338 U. S. 25; *Robinson* v. *California,* 370 U. S. 660; *Gideon* v. *Wainwright,* 372 U. S. 335; *Malloy* v. *Hogan,* 378 U. S. 1; *Pointer* v. *Texas, supra; Griffin* v. *California,* 380 U. S. 609.

[3] Madison himself had previously pointed out the dangers of inaccuracy resulting from the fact that "no language is so copious as to supply words and phrases for every complex idea." The Federalist, No. 37 (Cooke ed. 1961), at 236.

sential rights and that the specific mention of certain rights would be interpreted as a denial that others were protected.[4]

In presenting the proposed Amendment, Madison said:

> "It has been objected also against a bill of rights, that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration; and it might follow by implication, that those rights which were not singled out, were intended to be assigned into the hands of the General Government, and were consequently insecure. This is one of the most plausible arguments I have ever heard urged against the admission of a bill of rights into this system; but, I conceive, that it may be guarded against. I have attempted it, as gentlemen may see by turning to the

---

[4] Alexander Hamilton was opposed to a bill of rights on the ground that it was unnecessary because the Federal Government was a government of delegated powers and it was not granted the power to intrude upon fundamental personal rights. The Federalist, No. 84 (Cooke ed. 1961), at 578–579. He also argued,

"I go further, and affirm that bills of rights, in the sense and in the extent in which they are contended for, are not only unnecessary in the proposed constitution, but would even be dangerous. They would contain various exceptions to powers which are not granted; and on this very account, would afford a colourable pretext to claim more than were granted. For why declare that things shall not be done which there is no power to do? Why for instance, should it be said, that the liberty of the press shall not be restrained, when no power is given by which restrictions may be imposed? I will not contend that such a provision would confer a regulating power; but it is evident that it would furnish, to men disposed to usurp, a plausible pretence for claiming that power." *Id.*, at 579.

The Ninth Amendment and the Tenth Amendment, which provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," were apparently also designed in part to meet the above-quoted argument of Hamilton.

last clause of the fourth resolution [the Ninth Amendment]." I Annals of Congress 439 (Gales and Seaton ed. 1834).

Mr. Justice Story wrote of this argument against a bill of rights and the meaning of the Ninth Amendment:

"In regard to . . . [a] suggestion, that the affirmance of certain rights might disparage others, or might lead to argumentative implications in favor of other powers, it might be sufficient to say that such a course of reasoning could never be sustained upon any solid basis . . . . But a conclusive answer is, that such an attempt may be interdicted (as it has been) by a positive declaration in such a bill of rights that the enumeration of certain rights shall not be construed to deny or disparage others retained by the people." II Story, Commentaries on the Constitution of the United States 626–627 (5th ed. 1891).

He further stated, referring to the Ninth Amendment:

"This clause was manifestly introduced to prevent any perverse or ingenious misapplication of the well-known maxim, that an affirmation in particular cases implies a negation in all others; and, e converso, that a negation in particular cases implies an affirmation in all others." Id., at 651.

These statements of Madison and Story make clear that the Framers did not intend that the first eight amendments be construed to exhaust the basic and fundamental rights which the Constitution guaranteed to the people.[5]

While this Court has had little occasion to interpret the Ninth Amendment,[6] "[i]t cannot be presumed that any

---

[5] The Tenth Amendment similarly made clear that the States and the people retained all those powers not expressly delegated to the Federal Government.

[6] This Amendment has been referred to as "The Forgotten Ninth Amendment," in a book with that title by Bennett B. Patterson (1955). Other commentary on the Ninth Amendment includes Redlich, Are

clause in the constitution is intended to be without effect." *Marbury* v. *Madison,* 1 Cranch 137, 174. In interpreting the Constitution, "real effect should be given to all the words it uses." *Myers* v. *United States,* 272 U. S. 52, 151. The Ninth Amendment to the Constitution may be regarded by some as a recent discovery and may be forgotten by others, but since 1791 it has been a basic part of the Constitution which we are sworn to uphold. To hold that a right so basic and fundamental and so deep-rooted in our society as the right of privacy in marriage may be infringed because that right is not guaranteed in so many words by the first eight amendments to the Constitution is to ignore the Ninth Amendment and to give it no effect whatsoever. Moreover, a judicial construction that this fundamental right is not protected by the Constitution because it is not mentioned in explicit terms by one of the first eight amendments or elsewhere in the Constitution would violate the Ninth Amendment, which specifically states that

There "Certain Rights . . . Retained by the People"? 37 N. Y. U. L. Rev. 787 (1962), and Kelsey, The Ninth Amendment of the Federal Constitution, 11 Ind. L. J. 309 (1936). As far as I am aware, until today this Court has referred to the Ninth Amendment only in *United Public Workers* v. *Mitchell,* 330 U. S. 75, 94–95; *Tennessee Electric Power Co.* v. *TVA,* 306 U. S. 118, 143–144; and *Ashwander* v. *TVA,* 297 U. S. 288, 330–331. See also *Calder* v. *Bull,* 3 Dall. 386, 388; *Loan Assn.* v. *Topeka,* 20 Wall. 655, 662–663.

In *United Public Workers* v. *Mitchell, supra,* at 94–95, the Court stated: "We accept appellants' contention that the nature of political rights reserved to the people by the Ninth and Tenth Amendments [is] involved. The right claimed as inviolate may be stated as the right of a citizen to act as a party official or worker to further his own political views. Thus we have a measure of interference by the Hatch Act and the Rules with what otherwise would be the freedom of the civil servant under the First, Ninth and Tenth Amendments. And, if we look upon due process as a guarantee of freedom in those fields, there is a corresponding impairment of that right under the Fifth Amendment."

"[t]he enumeration in the Constitution, of certain rights, shall not be *construed* to deny or disparage others retained by the people." (Emphasis added.)

A dissenting opinion suggests that my interpretation of the Ninth Amendment somehow "broaden[s] the powers of this Court." *Post,* at 520. With all due respect, I believe that it misses the import of what I am saying. I do not take the position of my Brother BLACK in his dissent in *Adamson* v. *California,* 332 U. S. 46, 68, that the entire Bill of Rights is incorporated in the Fourteenth Amendment, and I do not mean to imply that the Ninth Amendment is applied against the States by the Fourteenth. Nor do I mean to state that the Ninth Amendment constitutes an independent source of rights protected from infringement by either the States or the Federal Government. Rather, the Ninth Amendment shows a belief of the Constitution's authors that fundamental rights exist that are not expressly enumerated in the first eight amendments and an intent that the list of rights included there not be deemed exhaustive. As any student of this Court's opinions knows, this Court has held, often unanimously, that the Fifth and Fourteenth Amendments protect certain fundamental personal liberties from abridgment by the Federal Government or the States. See, *e. g., Bolling* v. *Sharpe,* 347 U. S. 497; *Aptheker* v. *Secretary of State,* 378 U. S. 500; *Kent* v. *Dulles,* 357 U. S. 116; *Cantwell* v. *Connecticut,* 310 U. S. 296; *NAACP* v. *Alabama,* 357 U. S. 449; *Gideon* v. *Wainwright,* 372 U. S. 335; *New York Times Co.* v. *Sullivan,* 376 U. S. 254. The Ninth Amendment simply shows the intent of the Constitution's authors that other fundamental personal rights should not be denied such protection or disparaged in any other way simply because they are not specifically listed in the first eight constitutional amendments. I do not see how this broadens the author-

ity of the Court; rather it serves to support what this Court has been doing in protecting fundamental rights.

Nor am I turning somersaults with history in arguing that the Ninth Amendment is relevant in a case dealing with a *State's* infringement of a fundamental right. While the Ninth Amendment—and indeed the entire Bill of Rights—originally concerned restrictions upon *federal* power, the subsequently enacted Fourteenth Amendment prohibits the States as well from abridging fundamental personal liberties. And, the Ninth Amendment, in indicating that not all such liberties are specifically mentioned in the first eight amendments, is surely relevant in showing the existence of other fundamental personal rights, now protected from state, as well as federal, infringement. In sum, the Ninth Amendment simply lends strong support to the view that the "liberty" protected by the Fifth and Fourteenth Amendments from infringement by the Federal Government or the States is not restricted to rights specifically mentioned in the first eight amendments. Cf. *United Public Workers* v. *Mitchell,* 330 U. S. 75, 94–95.

In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather, they must look to the "traditions and [collective] conscience of our people" to determine whether a principle is "so rooted [there] . . . as to be ranked as fundamental." *Snyder* v. *Massachusetts,* 291 U. S. 97, 105. The inquiry is whether a right involved "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' . . . ." *Powell* v. *Alabama,* 287 U. S. 45, 67. "Liberty" also "gains content from the emanations of . . . specific [constitutional] guarantees" and "from experience with the requirements of a free society." *Poe*

v. *Ullman,* 367 U. S. 497, 517 (dissenting opinion of MR. JUSTICE DOUGLAS).[7]

I agree fully with the Court that, applying these tests, the right of privacy is a fundamental personal right, emanating "from the totality of the constitutional scheme under which we live." *Id.,* at 521. Mr. Justice Brandeis, dissenting in *Olmstead* v. *United States,* 277 U. S. 438, 478, comprehensively summarized the principles underlying the Constitution's guarantees of privacy:

"The protection guaranteed by the [Fourth and Fifth] Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone— the most comprehensive of rights and the right most valued by civilized men."

---

[7] In light of the tests enunciated in these cases it cannot be said that a judge's responsibility to determine whether a right is basic and fundamental in this sense vests him with unrestricted personal discretion. In fact, a hesitancy to allow too broad a discretion was a substantial reason leading me to conclude in *Pointer* v. *Texas, supra,* at 413–414, that those rights absorbed by the Fourteenth Amendment and applied to the States because they are fundamental apply with equal force and to the same extent against both federal and state governments. In *Pointer* I said that the contrary view would require "this Court to make the extremely subjective and excessively discretionary determination as to whether a practice, forbidden the Federal Government by a fundamental constitutional guarantee, is, as viewed in the factual circumstances surrounding each individual case, sufficiently repugnant to the notion of due process as to be forbidden the States." *Id.,* at 413.

The Connecticut statutes here involved deal with a particularly important and sensitive area of privacy—that of the marital relation and the marital home. This Court recognized in *Meyer* v. *Nebraska, supra,* that the right "to marry, establish a home and bring up children" was an essential part of the liberty guaranteed by the Fourteenth Amendment. 262 U. S., at 399. In *Pierce* v. *Society of Sisters,* 268 U. S. 510, the Court held unconstitutional an Oregon Act which forbade parents from sending their children to private schools because such an act "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U. S., at 534–535. As this Court said in *Prince* v. *Massachusetts,* 321 U. S. 158, at 166, the *Meyer* and *Pierce* decisions "have respected the private realm of family life which the state cannot enter."

I agree with MR. JUSTICE HARLAN's statement in his dissenting opinion in *Poe* v. *Ullman,* 367 U. S. 497, 551–552: "Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its pre-eminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right. . . . Of this whole 'private realm of family life' it is difficult to imagine what is more private or more intimate than a husband and wife's marital relations."

The entire fabric of the Constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected.

Although the Constitution does not speak in so many words of the right of privacy in marriage, I cannot believe that it offers these fundamental rights no protection. The fact that no particular provision of the Con-

stitution explicitly forbids the State from disrupting the traditional relation of the family—a relation as old and as fundamental as our entire civilization—surely does not show that the Government was meant to have the power to do so. Rather, as the Ninth Amendment expressly recognizes, there are fundamental personal rights such as this one, which are protected from abridgment by the Government though not specifically mentioned in the Constitution.

My Brother STEWART, while characterizing the Connecticut birth control law as "an uncommonly silly law," *post,* at 527, would nevertheless let it stand on the ground that it is not for the courts to " 'substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.' " *Post,* at 528. Elsewhere, I have stated that "[w]hile I quite agree with Mr. Justice Brandeis that . . . 'a . . . State may . . . serve as a laboratory; and try novel social and economic experiments,' *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 280, 311 (dissenting opinion), I do not believe that this includes the power to experiment with the fundamental liberties of citizens . . . ." [8] The vice of the dissenters' views is that it would permit such experimentation by the States in the area of the fundamental personal rights of its citizens. I cannot agree that the Constitution grants such power either to the States or to the Federal Government.

The logic of the dissents would sanction federal or state legislation that seems to me even more plainly unconstitutional than the statute before us. Surely the Government, absent a showing of a compelling subordinating state interest, could not decree that all husbands and wives must be sterilized after two children have been born

---

[8] *Pointer* v. *Texas, supra,* at 413. See also the discussion of my Brother DOUGLAS, *Poe* v. *Ullman, supra,* at 517–518 (dissenting opinion).

to them. Yet by their reasoning such an invasion of marital privacy would not be subject to constitutional challenge because, while it might be "silly," no provision of the Constitution specifically prevents the Government from curtailing the marital right to bear children and raise a family. While it may shock some of my Brethren that the Court today holds that the Constitution protects the right of marital privacy, in my view it is far more shocking to believe that the personal liberty guaranteed by the Constitution does not include protection against such totalitarian limitation of family size, which is at complete variance with our constitutional concepts. Yet, if upon a showing of a slender basis of rationality, a law outlawing voluntary birth control by married persons is valid, then, by the same reasoning, a law requiring compulsory birth control also would seem to be valid. In my view, however, both types of law would unjustifiably intrude upon rights of marital privacy which are constitutionally protected.

In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling," *Bates* v. *Little Rock,* 361 U. S. 516, 524. The law must be shown "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *McLaughlin* v. *Florida,* 379 U. S. 184, 196. See *Schneider* v. *Irvington,* 308 U. S. 147, 161.

Although the Connecticut birth-control law obviously encroaches upon a fundamental personal liberty, the State does not show that the law serves any "subordinating [state] interest which is compelling" or that it is "neces-

sary . . . to the accomplishment of a permissible state policy." The State, at most, argues that there is some rational relation between this statute and what is admittedly a legitimate subject of state concern—the discouraging of extra-marital relations. It says that preventing the use of birth-control devices by married persons helps prevent the indulgence by some in such extra-marital relations. The rationality of this justification is dubious, particularly in light of the admitted widespread availability to all persons in the State of Connecticut, unmarried as well as married, of birth-control devices for the prevention of disease, as distinguished from the prevention of conception, see *Tileston* v. *Ullman,* 129 Conn. 84, 26 A. 2d 582. But, in any event, it is clear that the state interest in safeguarding marital fidelity can be served by a more discriminately tailored statute, which does not, like the present one, sweep unnecessarily broadly, reaching far beyond the evil sought to be dealt with and intruding upon the privacy of all married couples. See *Aptheker* v. *Secretary of State,* 378 U. S. 500, 514; *NAACP* v. *Alabama,* 377 U. S. 288, 307–308; *McLaughlin* v. *Florida, supra,* at 196. Here, as elsewhere, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP* v. *Button,* 371 U. S. 415, 438. The State of Connecticut does have statutes, the constitutionality of which is beyond doubt, which prohibit adultery and fornication. See Conn. Gen. Stat. §§ 53–218, 53–219 *et seq.* These statutes demonstrate that means for achieving the same basic purpose of protecting marital fidelity are available to Connecticut without the need to "invade the area of protected freedoms." *NAACP* v. *Alabama, supra,* at 307. See *McLaughlin* v. *Florida, supra,* at 196.

Finally, it should be said of the Court's holding today that it in no way interferes with a State's proper regula-

tion of sexual promiscuity or misconduct. As my Brother HARLAN so well stated in his dissenting opinion in *Poe* v. *Ullman, supra,* at 553.

> "Adultery, homosexuality and the like are sexual intimacies which the State forbids . . . but the intimacy of husband and wife is necessarily an essential and .accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and protected. It is one thing when the State exerts its power either to forbid extra-marital sexuality . . . or to say who may marry, but it is quite another when, having acknowledged a marriage and the intimacies inherent in it, it undertakes to regulate by means of the criminal law the details of that intimacy."

In sum, I believe that the right of privacy in the marital relation is fundamental and basic—a personal right "retained by the people" within the meaning of the Ninth Amendment. Connecticut cannot constitutionally abridge this fundamental right, which is protected by the Fourteenth Amendment from infringement by the States. I agree with the Court that petitioners' convictions must therefore be reversed.

MR. JUSTICE HARLAN, concurring in the judgment.

I fully agree with the judgment of reversal, but find myself unable to join the Court's opinion. The reason is that it seems to me to evince an approach to this case very much like that taken by my Brothers BLACK and STEWART in dissent, namely: the Due Process Clause of the Fourteenth Amendment does not touch this Connecticut statute unless the enactment is found to violate some right assured by the letter or penumbra of the Bill of Rights.

In other words, what I find implicit in the Court's opinion is that the "incorporation" doctrine may be used to *restrict* the reach of Fourteenth Amendment Due Process. For me this is just as unacceptable constitutional doctrine as is the use of the "incorporation" approach to *impose* upon the States all the requirements of the Bill of Rights as found in the provisions of the first eight amendments and in the decisions of this Court interpreting them. See, *e. g.,* my concurring opinions in *Pointer* v. *Texas,* 380 U. S. 400, 408, and *Griffin* v. *California,* 380 U. S. 609, 615, and my dissenting opinion in *Poe* v. *Ullman,* 367 U. S. 497, 522, at pp. 539–545.

In my view, the proper constitutional inquiry in this case is whether this Connecticut statute infringes the Due Process Clause of the Fourteenth Amendment because the enactment violates basic values "implicit in the concept of ordered liberty," *Palko* v. *Connecticut,* 302 U. S. 319, 325. For reasons stated at length in my dissenting opinion in *Poe* v. *Ullman, supra,* I believe that it does. While the relevant inquiry may be aided by resort to one or more of the provisions of the Bill of Rights, it is not dependent on them or any of their radiations. The Due Process Clause of the Fourteenth Amendment stands, in my opinion, on its own bottom.

A further observation seems in order respecting the justification of my Brothers BLACK and STEWART for their "incorporation" approach to this case. Their approach does not rest on historical reasons, which are of course wholly lacking (see Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan. L. Rev. 5 (1949)), but on the thesis that by limiting the content of the Due Process Clause of the Fourteenth Amendment to the protection of rights which can be found elsewhere in the Constitution, in this instance in the Bill of Rights, judges will thus be confined to "interpretation" of specific constitutional

provisions, and will thereby be restrained from introducing their own notions of constitutional right and wrong into the "vague contours of the Due Process Clause." *Rochin* v. *California,* 342 U. S. 165, 170.

While I could not more heartily agree that judicial "self restraint" is an indispensable ingredient of sound constitutional adjudication, I do submit that the formula suggested for achieving it is more hollow than real. "Specific" provisions of the Constitution, no less than "due process," lend themselves as readily to "personal" interpretations by judges whose constitutional outlook is simply to keep the Constitution in supposed "tune with the times" (*post,* p. 522). Need one go further than to recall last Term's reapportionment cases, *Wesberry* v. *Sanders,* 376 U. S. 1, and *Reynolds* v. *Sims,* 377 U. S. 533, where a majority of the Court "interpreted" "by the People" (Art. I, § 2) and "equal protection" (Amdt. 14) to command "one person, one vote," an interpretation that was made in the face of irrefutable and still unanswered history to the contrary? See my dissenting opinions in those cases, 376 U. S., at 20; 377 U. S., at 589.

Judicial self-restraint will not, I suggest, be brought about in the "due process" area by the historically unfounded incorporation formula long advanced by my Brother BLACK, and now in part espoused by my Brother STEWART. It will be achieved in this area, as in other constitutional areas, only by continual insistence upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms. See *Adamson* v. *California,* 332 U. S. 46, 59 (Mr. Justice Frankfurter, concurring). Adherence to these principles will not, of course, obviate all constitutional differences of opinion among judges, nor should it. Their continued recogni-

tion will, however, go farther toward keeping most judges from roaming at large in the constitutional field than will the interpolation into the Constitution of an artificial and largely illusory restriction on the content of the Due Process Clause.*

MR. JUSTICE WHITE, concurring in the judgment.

In my view this Connecticut law as applied to married couples deprives them of "liberty" without due process of law, as that concept is used in the Fourteenth Amendment. I therefore concur in the judgment of the Court reversing these convictions under Connecticut's aiding and abetting statute.

It would be unduly repetitious, and belaboring the obvious, to expound on the impact of this statute on the liberty guaranteed by the Fourteenth Amendment against arbitrary or capricious denials or on the nature of this liberty. Suffice it to say that this is not the first time this Court has had occasion to articulate that the liberty entitled to protection under the Fourteenth Amendment includes the right "to marry, establish a home and bring up children," *Meyer v. Nebraska,* 262 U. S. 390, 399, and "the liberty . . . to direct the upbringing and education of children," *Pierce v. Society of Sisters,* 268 U. S. 510, 534–535, and that these are among "the basic civil rights of man." *Skinner v. Oklahoma,* 316 U. S. 535, 541. These decisions affirm that there is a "realm of family life which the state cannot enter" without substantial justification. *Prince v. Massachusetts,* 321 U. S. 158, 166. Surely the right invoked in this case, to be free of regulation of the intimacies of

---

*Indeed, my Brother BLACK, in arguing his thesis, is forced to lay aside a host of cases in which the Court has recognized fundamental rights in the Fourteenth Amendment without specific reliance upon the Bill of Rights. *Post,* p. 512, n. 4.

the marriage relationship, "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." *Kovacs* v. *Cooper,* 336 U. S. 77, 95 (opinion of Frankfurter, J.).

The Connecticut anti-contraceptive statute deals rather substantially with this relationship. For it forbids all married persons the right to use birth-control devices, regardless of whether their use is dictated by considerations of family planning, *Trubek* v. *Ullman,* 147 Conn. 633, 165 A. 2d 158, health, or indeed even of life itself. *Buxton* v. *Ullman,* 147 Conn. 48, 156 A. 2d 508. The anti-use statute, together with the general aiding and abetting statute, prohibits doctors from affording advice to married persons on proper and effective methods of birth control. *Tileston* v. *Ullman,* 129 Conn. 84, 26 A. 2d 582. And the clear effect of these statutes, as enforced, is to deny disadvantaged citizens of Connecticut, those without either adequate knowledge or resources to obtain private counseling, access to medical assistance and up-to-date information in respect to proper methods of birth control. *State* v. *Nelson,* 126 Conn. 412, 11 A. 2d 856; *State* v. *Griswold,* 151 Conn. 544, 200 A. 2d 479. In my view, a statute with these effects bears a substantial burden of justification when attacked under the Fourteenth Amendment. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Skinner* v. *Oklahoma,* 316 U. S. 535; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232; *McLaughlin* v. *Florida,* 379 U. S. 184, 192.

An examination of the justification offered, however, cannot be avoided by saying that the Connecticut anti-use statute invades a protected area of privacy and association or that it demeans the marriage relationship. The nature of the right invaded is pertinent, to be sure, for statutes regulating sensitive areas of liberty do, under

the cases of this Court, require "strict scrutiny," *Skinner* v. *Oklahoma,* 316 U. S. 535, 541, and "must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton* v. *Tucker,* 364 U. S. 479, 488. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." *Bates* v. *Little Rock,* 361 U. S. 516, 524. See also *McLaughlin* v. *Florida,* 379 U. S. 184. But such statutes, if reasonably necessary for the effectuation of a legitimate and substantial state interest, and not arbitrary or capricious in application, are not invalid under the Due Process Clause. *Zemel* v. *Rusk,* 381 U. S. 1.*

---

*Dissenting opinions assert that the liberty guaranteed by the Due Process Clause is limited to a guarantee against unduly vague statutes and against procedural unfairness at trial. Under this view the Court is without authority to ascertain whether a challenged statute, or its application, has a permissible purpose and whether the manner of regulation bears a rational or justifying relationship to this purpose. A long line of cases makes very clear that this has not been the view of this Court. *Dent* v. *West Virginia,* 129 U. S. 114; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Douglas* v. *Noble,* 261 U. S. 165; *Meyer* v. *Nebraska,* 262 U. S. 390; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232; *Aptheker* v. *Secretary of State,* 378 U. S. 500; *Zemel* v. *Rusk,* 381 U. S. 1.

The traditional due process test was well articulated, and applied, in *Schware* v. *Board of Bar Examiners, supra,* a case which placed no reliance on the specific guarantees of the Bill of Rights.

"A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. *Dent* v. *West Virginia,* 129 U. S. 114. Cf. *Slochower* v. *Board of Education,* 350 U. S. 551; *Wieman* v. *Updegraff,* 344 U. S. 183. And see *Ex parte Secombe,* 19 How. 9, 13. A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. *Douglas* v. *Noble,* 261 U. S. 165; *Cum-*

As I read the opinions of the Connecticut courts and the argument of Connecticut in this Court, the State claims but one justification for its anti-use statute. Cf. *Allied Stores of Ohio* v. *Bowers,* 358 U. S. 522, 530; *Martin* v. *Walton,* 368 U. S. 25, 28 (DOUGLAS, J., dissenting). There is no serious contention that Connecticut thinks the use of artificial or external methods of contraception immoral or unwise in itself, or that the anti-use statute is founded upon any policy of promoting population expansion. Rather, the statute is said to serve the State's policy against all forms of promiscuous or illicit sexual relationships, be they premarital or extramarital, concededly a permissible and legitimate legislative goal.

Without taking issue with the premise that the fear of conception operates as a deterrent to such relationships in addition to the criminal proscriptions Connecticut has against such conduct, I wholly fail to see how the ban on the use of contraceptives by married couples in any way reinforces the State's ban on illicit sexual relationships. See *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 239. Connecticut does not bar the importation or possession of contraceptive devices; they are not considered contraband material under state law, *State* v. *Certain Contraceptive Materials,* 126 Conn. 428, 11 A. 2d 863, and their availability in that State is not seriously disputed. The only way Connecticut seeks to limit or control the availability of such devices is through its general aiding and abetting statute whose operation in this context has

*mings* v. *Missouri,* 4 Wall. 277, 319–320. Cf. *Nebbia* v. *New York,* 291 U. S. 502. Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory." 353 U. S., at 238–239. Cf. *Martin* v. *Walton,* 368 U. S. 25, 26 (DOUGLAS, J., dissenting).

been quite obviously ineffective and whose most serious use has been against birth-control clinics rendering advice to married, rather than unmarried, persons. Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356. Indeed, after over 80 years of the State's proscription of use, the legality of the sale of such devices to prevent disease has never been expressly passed upon, although it appears that sales have long occurred and have only infrequently been challenged. This "undeviating policy . . . throughout all the long years . . . bespeaks more than prosecutorial paralysis." *Poe* v. *Ullman,* 367 U. S. 497, 502. Moreover, it would appear that the sale of contraceptives to prevent disease is plainly legal under Connecticut law.

In these circumstances one is rather hard pressed to explain how the ban on use by married persons in any way prevents use of such devices by persons engaging in illicit sexual relations and thereby contributes to the State's policy against such relationships. Neither the state courts nor the State before the bar of this Court has tendered such an explanation. It is purely fanciful to believe that the broad proscription on use facilitates discovery of use by persons engaging in a prohibited relationship or for some other reason makes such use more unlikely and thus can be supported by any sort of administrative consideration. Perhaps the theory is that the flat ban on use prevents married people from possessing contraceptives and without the ready availability of such devices for use in the marital relationship, there will be no or less temptation to use them in extramarital ones. This reasoning rests on the premise that married people will comply with the ban in regard to their marital relationship, notwithstanding total nonenforcement in this context and apparent nonenforcibility, but will not comply with criminal statutes prohibiting extramarital affairs and the anti-use statute in respect to illicit sexual relationships, a premise whose validity has not been

demonstrated and whose intrinsic validity is not very evident. At most the broad ban is of marginal utility to the declared objective. A statute limiting its prohibition on use to persons engaging in the prohibited relationship would serve the end posited by Connecticut in the same way, and with the same effectiveness, or ineffectiveness, as the broad anti-use statute under attack in this case. I find nothing in this record justifying the sweeping scope of this statute, with its telling effect on the freedoms of married persons, and therefore conclude that it deprives such persons of liberty without due process of law.

MR. JUSTICE BLACK, with whom MR. JUSTICE STEWART joins, dissenting.

I agree with my Brother STEWART's dissenting opinion. And like him I do not to any extent whatever base my view that this Connecticut law is constitutional on a belief that the law is wise or that its policy is a good one. In order that there may be no room at all to doubt why I vote as I do, I feel constrained to add that the law is every bit as offensive to me as it is to my Brethren of the majority and my Brothers HARLAN, WHITE and GOLD-BERG who, reciting reasons why it is offensive to them, hold it unconstitutional. There is no single one of the graphic and eloquent strictures and criticisms fired at the policy of this Connecticut law either by the Court's opinion or by those of my concurring Brethren to which I cannot subscribe—except their conclusion that the evil qualities they see in the law make it unconstitutional.

Had the doctor defendant here, or even the nondoctor defendant, been convicted for doing nothing more than expressing opinions to persons coming to the clinic that certain contraceptive devices, medicines or practices would do them good and would be desirable, or for telling people how devices could be used, I can think of no reasons at this time why their expressions of views would not be

protected by the First and Fourteenth Amendments, which guarantee freedom of speech. Cf. *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U. S. 1; *NAACP* v. *Button,* 371 U. S. 415. But speech is one thing; conduct and physical activities are quite another. See, *e. g., Cox* v. *Louisiana,* 379 U. S. 536, 554–555; *Cox* v. *Louisiana,* 379 U. S. 559, 563–564; *id.,* 575–584 (concurring opinion); *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490; cf. *Reynolds* v. *United States,* 98 U. S. 145, 163–164. The two defendants here were active participants in an organization which gave physical examinations to women, advised them what kind of contraceptive devices or medicines would most likely be satisfactory for them, and then supplied the devices themselves, all for a graduated scale of fees, based on the family income. Thus these defendants admittedly engaged with others in a planned course of conduct to help people violate the Connecticut law. Merely because some speech was used in carrying on that conduct—just as in ordinary life some speech accompanies most kinds of conduct—we are not in my view justified in holding that the First Amendment forbids the State to punish their conduct. Strongly as I desire to protect all First Amendment freedoms, I am unable to stretch the Amendment so as to afford protection to the conduct of these defendants in violating the Connecticut law. What would be the constitutional fate of the law if hereafter applied to punish nothing but speech is, as I have said, quite another matter.

The Court talks about a constitutional "right of privacy" as though there is some constitutional provision or provisions forbidding any law ever to be passed which might abridge the "privacy" of individuals. But there is not. There are, of course, guarantees in certain specific constitutional provisions which are designed in part to protect privacy at certain times and places with respect to certain activities. Such, for example, is the Fourth

Amendment's guarantee against "unreasonable searches and seizures." But I think it belittles that Amendment to talk about it as though it protects nothing but "privacy." To treat it that way is to give it a niggardly interpretation, not the kind of liberal reading I think any Bill of Rights provision should be given. The average man would very likely not have his feelings soothed any more by having his property seized openly than by having it seized privately and by stealth. He simply wants his property left alone. And a person can be just as much, if not more, irritated, annoyed and injured by an unceremonious public arrest by a policeman as he is by a seizure in the privacy of his office or home.

One of the most effective ways of diluting or expanding a constitutionally guaranteed right is to substitute for the crucial word or words of a constitutional guarantee another word or words, more or less flexible and more or less restricted in meaning. This fact is well illustrated by the use of the term "right of privacy" as a comprehensive substitute for the Fourth Amendment's guarantee against "unreasonable searches and seizures." "Privacy" is a broad, abstract and ambiguous concept which can easily be shrunken in meaning but which can also, on the other hand, easily be interpreted as a constitutional ban against many things other than searches and seizures. I have expressed the view many times that First Amendment freedoms, for example, have suffered from a failure of the courts to stick to the simple language of the First Amendment in construing it, instead of invoking multitudes of words substituted for those the Framers used. See, *e. g., New York Times Co.* v. *Sullivan,* 376 U. S. 254, 293 (concurring opinion); cases collected in *City of El Paso* v. *Simmons,* 379 U. S. 497, 517, n. 1 (dissenting opinion); Black, The Bill of Rights, 35 N. Y. U. L. Rev. 865. For these reasons I get nowhere in this case by talk about a constitutional "right of privacy" as an emanation from

one or more constitutional provisions.[1]  I like my privacy as well as the next one, but I am nevertheless compelled to admit that government has a right to invade it unless prohibited by some specific constitutional provision.  For these reasons I cannot agree with the Court's judgment and the reasons it gives for holding this Connecticut law unconstitutional.

This brings me to the arguments made by my Brothers HARLAN, WHITE and GOLDBERG for invalidating the Connecticut law.  Brothers HARLAN [2] and WHITE would invalidate it by reliance on the Due Process Clause of the Fourteenth Amendment, but Brother GOLDBERG, while agreeing with Brother HARLAN, relies also on the Ninth Amendment.  I have no doubt that the Connecticut law could be applied in such a way as to abridge freedom of

---

[1] The phrase "right to privacy" appears first to have gained currency from an article written by Messrs. Warren and (later Mr. Justice) Brandeis in 1890 which urged that States should give some form of tort relief to persons whose private affairs were exploited by others. The Right to Privacy, 4 Harv. L. Rev. 193.  Largely as a result of this article, some States have passed statutes creating such a cause of action, and in others state courts have done the same thing by exercising their powers as courts of common law.  See generally 41 Am. Jur. 926–927.  Thus the Supreme Court of Georgia, in granting a cause of action for damages to a man whose picture had been used in a newspaper advertisement without his consent, said that "A right of privacy in matters purely private is . . . derived from natural law" and that "The conclusion reached by us seems to be . . . thoroughly in accord with natural justice, with the principles of the law of every civilized nation, and especially with the elastic principles of the common law . . . ." *Pavesich* v. *New England Life Ins. Co.*, 122 Ga. 190, 194, 218, 50 S. E. 68, 70, 80.  Observing that "the right of privacy . . . presses for recognition here," today this Court, which I did not understand to have power to sit as a court of common law, now appears to be exalting a phrase which Warren and Brandeis used in discussing grounds for tort relief, to the level of a constitutional rule which prevents state legislatures from passing any law deemed by this Court to interfere with "privacy."

[2] Brother HARLAN's views are spelled out at greater length in his dissenting opinion in *Poe* v. *Ullman*, 367 U. S. 497, 539–555.

speech and press and therefore violate the First and Fourteenth Amendments. My disagreement with the Court's opinion holding that there is such a violation here is a narrow one, relating to the application of the First Amendment to the facts and circumstances of this particular case. But my disagreement with Brothers HARLAN, WHITE and GOLDBERG is more basic. I think that if properly construed neither the Due Process Clause nor the Ninth Amendment, nor both together, could under any circumstances be a proper basis for invalidating the Connecticut law. I discuss the due process and Ninth Amendment arguments together because on analysis they turn out to be the same thing—merely using different words to claim for this Court and the federal judiciary power to invalidate any legislative act which the judges find irrational, unreasonable or offensive.

The due process argument which my Brothers HARLAN and WHITE adopt here is based, as their opinions indicate, on the premise that this Court is vested with power to invalidate all state laws that it considers to be arbitrary, capricious, unreasonable, or oppressive, or on this Court's belief that a particular state law under scrutiny has no "rational or justifying" purpose, or is offensive to a "sense of fairness and justice." [3] If these formulas based on "natural justice," or others which mean the same thing,[4] are to prevail, they require judges to determine

---

[3] Indeed, Brother WHITE appears to have gone beyond past pronouncements of the natural law due process theory, which at least said that the Court should exercise this unlimited power to declare state acts unconstitutional with "restraint." He now says that, instead of being presumed constitutional (see *Munn* v. *Illinois*, 94 U. S. 113, 123; compare *Adkins* v. *Children's Hospital*, 261 U. S. 525, 544), the statute here "bears a substantial burden of justification when attacked under the Fourteenth Amendment."

[4] A collection of the catchwords and catch phrases invoked by judges who would strike down under the Fourteenth Amendment laws which offend their notions of natural justice would fill many pages. Thus it has been said that this Court can forbid state action

what is or is not constitutional on the basis of their own appraisal of what laws are unwise or unnecessary. The power to make such decisions is of course that of a legislative body. Surely it has to be admitted that no provision of the Constitution specifically gives such blanket power to courts to exercise such a supervisory veto over the wisdom and value of legislative policies and to hold unconstitutional those laws which they believe unwise or dangerous. I readily admit that no legislative body, state or national, should pass laws that can justly be given any

---

which "shocks the conscience," *Rochin* v. *California,* 342 U. S. 165, 172, sufficiently to "shock itself into the protective arms of the Constitution," *Irvine* v. *California,* 347 U. S. 128, 138 (concurring opinion). It has been urged that States may not run counter to the "decencies of civilized conduct," *Rochin, supra,* at 173, or "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder* v. *Massachusetts,* 291 U. S. 97, 105, or to "those canons of decency and fairness which express the notions of justice of English-speaking peoples," *Malinski* v. *New York,* 324 U. S. 401, 417 (concurring opinion), or to "the community's sense of fair play and decency," *Rochin, supra,* at 173. It has been said that we must decide whether a state law is "fair, reasonable and appropriate," or is rather "an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into . . . contracts," *Lochner* v. *New York,* 198 U. S. 45, 56. States, under this philosophy, cannot act in conflict with "deeply rooted feelings of the community," *Haley* v. *Ohio,* 332 U. S. 596, 604 (separate opinion), or with "fundamental notions of fairness and justice," *id.,* 607. See also, *e. g., Wolf* v. *Colorado,* 338 U. S. 25, 27 ("rights . . . basic to our free society"); *Hebert* v. *Louisiana,* 272 U. S. 312, 316 ("fundamental principles of liberty and justice"); *Adkins* v. *Children's Hospital,* 261 U. S. 525, 561 ("arbitrary restraint of . . . liberties"); *Betts* v. *Brady,* 316 U. S. 455, 462 ("denial of fundamental fairness, shocking to the universal sense of justice"); *Poe* v. *Ullman,* 367 U. S. 497, 539 (dissenting opinion) ("intolerable and unjustifiable"). Perhaps the clearest, frankest and briefest explanation of how this due process approach works is the statement in another case handed down today that this Court is to invoke the Due Process Clause to strike down state procedures or laws which it can "not tolerate." *Linkletter* v. *Walker, post,* p. 618, at 631.

of the invidious labels invoked as constitutional excuses to strike down state laws. But perhaps it is not too much to say that no legislative body ever does pass laws without believing that they will accomplish a sane, rational, wise and justifiable purpose. While I completely subscribe to the holding of *Marbury* v. *Madison*, 1 Cranch 137, and subsequent cases, that our Court has constitutional power to strike down statutes, state or federal, that violate commands of the Federal Constitution, I do not believe that we are granted power by the Due Process Clause or any other constitutional provision or provisions to measure constitutionality by our belief that legislation is arbitrary, capricious or unreasonable, or accomplishes no justifiable purpose, or is offensive to our own notions of "civilized standards of conduct." [5] Such an appraisal of the wisdom of legislation is an attribute of the power to make laws, not of the power to interpret them. The use by federal courts of such a formula or doctrine or whatnot to veto federal or state laws simply takes away from Congress and States the power to make laws based on their own judgment of fairness and wisdom and transfers that power to this Court for ultimate determination—a power which was specifically denied to federal courts by the convention that framed the Constitution.[6]

---

[5] See Hand, The Bill of Rights (1958) 70:

"[J]udges are seldom content merely to annul the particular solution before them; they do not, indeed they may not, say that taking all things into consideration, the legislators' solution is too strong for the judicial stomach. On the contrary they wrap up their veto in a protective veil of adjectives such as 'arbitrary,' 'artificial,' 'normal,' 'reasonable,' 'inherent,' 'fundamental,' or 'essential,' whose office usually, though quite innocently, is to disguise what they are doing and impute to it a derivation far more impressive than their personal preferences, which are all that in fact lie behind the decision." See also *Rochin* v. *California,* 342 U. S. 165, 174 (concurring opinion). But see *Linkletter* v. *Walker, supra,* n. 4, at 631.

[6] This Court held in *Marbury* v. *Madison,* 1 Cranch 137, that this Court has power to invalidate laws on the ground that they exceed

Of the cases on which my Brothers WHITE and GOLD-
BERG rely so heavily, undoubtedly the reasoning of two of
them supports their result here—as would that of a num-
ber of others which they do not bother to name, *e. g.,*

the constitutional power of Congress or violate some specific prohi-
bition of the Constitution.  See also *Fletcher* v. *Peck,* 6 Cranch 87.
But the Constitutional Convention did on at least two occasions
reject proposals which would have given the federal judiciary a part
in recommending laws or in vetoing as bad or unwise the legislation
passed by the Congress.  Edmund Randolph of Virginia proposed
that the President

". . . and a convenient number of the National Judiciary, ought
to compose a council of revision with authority to examine every
act of the National Legislature before it shall operate, & every act
of a particular Legislature before a Negative thereon shall be final;
and that the dissent of the said Council shall amount to a rejection,
unless the Act of the National Legislature be again passed, or that
of a particular Legislature be again negatived by      [original
wording illegible] of the members of each branch."  1 The Records
of the Federal Convention of 1787 (Farrand ed. 1911) 21.

In support of a plan of this kind James Wilson of Pennsylvania
argued that:

". . . It had been said that the Judges, as expositors of the Laws
would have an opportunity of defending their constitutional rights.
There was weight in this observation; but this power of the Judges
did not go far enough.  Laws may be unjust, may be unwise, may be
dangerous, may be destructive; and yet not be so unconstitutional as
to justify the Judges in refusing to give them effect.  Let them have
a share in the Revisionary power, and they will have an opportunity
of taking notice of these characters of a law, and of counteracting,
by the weight of their opinions the improper views of the Legisla-
ture."  2 *id.,* at 73.

Nathaniel Gorham of Massachusetts "did not see the advantage of
employing the Judges in this way.  As Judges they are not to be
presumed to possess any peculiar knowledge of the mere policy of
public measures."  *Ibid.*

Elbridge Gerry of Massachusetts likewise opposed the proposal for
a council of revision:

". . . He relied for his part on the Representatives of the people as
the guardians of their Rights & interests.  It [the proposal] was

*Lochner* v. *New York,* 198 U. S. 45, *Coppage* v. *Kansas,*
236 U. S. 1, *Jay Burns Baking Co.* v. *Bryan,* 264 U. S.
504, and *Adkins* v. *Children's Hospital,* 261 U. S. 525.
The two they do cite and quote from, *Meyer* v. *Nebraska,*
262 U. S. 390, and *Pierce* v. *Society of Sisters,* 268 U. S.
510, were both decided in opinions by Mr. Justice
McReynolds which elaborated the same natural law due
process philosophy found in *Lochner* v. *New York, supra,*
one of the cases on which he relied in *Meyer,* along with
such other long-discredited decisions as, *e. g., Adams* v.
*Tanner,* 244 U. S. 590, and *Adkins* v. *Children's Hospital,
supra.* *Meyer* held unconstitutional, as an "arbitrary"
and unreasonable interference with the right of a teacher
to carry on his occupation and of parents to hire him, a

---

making the Expositors of the Laws, the Legislators which ought never
to be done." *Id.,* at 75.

And at another point:

"Mr. Gerry doubts whether the Judiciary ought to form a part
of it [the proposed council of revision], as they will have a suffi-
cient check agst. encroachments on their own department by their
exposition of the laws, which involved a power of deciding on their
Constitutionality. . . . It was quite foreign from the nature of ye.
office to make them judges of the policy of public measures." 1 *Id.,*
at 97–98.

Madison supported the proposal on the ground that "a Check [on
the legislature] is necessary." *Id.,* at 108. John Dickinson of Dela-
ware opposed it on the ground that "the Judges must interpret the
Laws they ought not to be legislators." *Ibid.* The proposal for a
council of revision was defeated.

The following proposal was also advanced:

"To assist the President in conducting the Public affairs there shall
be a Council of State composed of the following officers—1. The Chief
Justice of the Supreme Court, who shall from time to time recommend
such alterations of and additions to the laws of the U. S. as may in
his opinion be necessary to the due administration of Justice, and
such as may promote useful learning and inculcate sound morality
throughout the Union . . . ." 2 *id.,* at 342. This proposal too was
rejected.

state law forbidding the teaching of modern foreign languages to young children in the schools.[7] And in *Pierce,* relying principally on *Meyer,* Mr. Justice McReynolds said that a state law requiring that all children attend public schools interfered unconstitutionally with the property rights of private school corporations because it was an "arbitrary, unreasonable and unlawful interference" which threatened "destruction of their business and property." 268 U. S., at 536. Without expressing an opinion as to whether either of those cases reached a correct result in light of our later decisions applying the First Amendment to the States through the Fourteenth,[8] I merely point out that the reasoning stated in *Meyer* and *Pierce* was the same natural law due process philosophy which many later opinions repudiated, and which I cannot accept. Brothers WHITE and GOLDBERG also cite other cases, such as *NAACP* v. *Button,* 371 U. S. 415, *Shelton* v. *Tucker,* 364 U. S. 479, and *Schneider* v. *State,* 308 U. S. 147, which held that States in regulating conduct could not, consistently with the First Amendment as applied to them by the Fourteenth, pass unnecessarily broad laws which might indirectly infringe on First Amendment freedoms.[9] See *Brotherhood of Railroad Trainmen* v. *Virginia ex rel.*

---

[7] In *Meyer,* in the very same sentence quoted in part by my Brethren in which he asserted that the Due Process Clause gave an abstract and inviolable right "to marry, establish a home and bring up children," Mr. Justice McReynolds also asserted the heretofore discredited doctrine that the Due Process Clause prevented States from interfering with "the right of the individual to contract." 262 U. S., at 399.

[8] Compare *Poe* v. *Ullman,* 367 U. S., at 543–544 (HARLAN, J., dissenting).

[9] The Court has also said that in view of the Fourteenth Amendment's major purpose of eliminating state-enforced racial discrimination, this Court will scrutinize carefully any law embodying a racial classification to make sure that it does not deny equal protection of the laws. See *McLaughlin* v. *Florida,* 379 U. S. 184.

*Virginia State Bar,* 377 U. S. 1, 7–8.[10]   Brothers WHITE
and GOLDBERG now apparently would start from this re-
quirement that laws be narrowly drafted so as not to cur-
tail free speech and assembly, and extend it limitlessly to
require States to justify any law restricting "liberty" as
my Brethren define "liberty."   This would mean at the

---

[10] None of the other cases decided in the past 25 years which
Brothers WHITE and GOLDBERG cite can justly be read as holding
that judges have power to use a natural law due process formula
to strike down all state laws which they think are unwise, dangerous,
or irrational.   *Prince* v. *Massachusetts,* 321 U. S. 158, *upheld* a state
law forbidding minors from selling publications on the streets.   *Kent* v.
*Dulles,* 357 U. S. 116, recognized the power of Congress to restrict
travel outside the country so long as it accorded persons the procedural
safeguards of due process and did not violate any other specific con-
stitutional provision.   *Schware* v. *Board of Bar Examiners,* 353 U. S.
232, held simply that a State could not, consistently with due process,
refuse a lawyer a license to practice law on the basis of a finding that
he was morally unfit when there was no evidence in the record, 353
U. S., at 246–247, to support such a finding.   Compare *Thompson* v.
*City of Louisville,* 362 U. S. 199, in which the Court relied in part
on *Schware.*  See also *Konigsberg* v. *State Bar,* 353 U. S. 252.   And
*Bolling* v. *Sharpe,* 347 U. S. 497, merely recognized what had been
the understanding from the beginning of the country, an understand-
ing shared by many of the draftsmen of the Fourteenth Amendment,
that the whole Bill of Rights, including the Due Process Clause of
the Fifth Amendment, was a guarantee that all persons would receive
equal treatment under the law.   Compare *Chambers* v. *Florida,* 309
U. S. 227, 240–241.   With one exception, the other modern cases relied
on by my Brethren were decided either solely under the Equal Protec-
tion Clause of the Fourteenth Amendment or under the First Amend-
ment, made applicable to the States by the Fourteenth, some of the
latter group involving the right of association which this Court has
held to be a part of the rights of speech, press and assembly guaran-
teed by the First Amendment.   As for *Aptheker* v. *Secretary of
State,* 378 U. S. 500, I am compelled to say that if that decision was
written or intended to bring about the abrupt and drastic reversal
in the course of constitutional adjudication which is now attributed
to it, the change was certainly made in a very quiet and unprovoca-
tive manner, without any attempt to justify it.

very least, I suppose, that every state criminal statute—
since it must inevitably curtail "liberty" to some extent—
would be suspect, and would have to be justified to this
Court.[11]

My Brother GOLDBERG has adopted the recent dis-
covery [12] that the Ninth Amendment as well as the Due
Process Clause can be used by this Court as authority
to strike down all state legislation which this Court thinks

---

[11] Compare *Adkins* v. *Children's Hospital*, 261 U. S. 525, 568
(Holmes, J., dissenting):

"The earlier decisions upon the same words [the Due Process
Clause] in the Fourteenth Amendment began within our memory and
went no farther than an unpretentious assertion of the liberty to fol-
low the ordinary callings. Later that innocuous generality was ex-
panded into the dogma, Liberty of Contract. Contract is not specially
mentioned in the text that we have to construe. It is merely an ex-
ample of doing what you want to do, embodied in the word liberty.
But pretty much all law consists in forbidding men to do some things
that they want to do, and contract is no more exempt from law than
other acts."

[12] See Patterson, The Forgotten Ninth Amendment (1955). Mr.
Patterson urges that the Ninth Amendment be used to protect un-
specified "natural and inalienable rights." P. 4. The Introduction
by Roscoe Pound states that "there is a marked revival of natural
law ideas throughout the world. Interest in the Ninth Amendment
is a symptom of that revival." P. iii.

In Redlich, Are There "Certain Rights . . . Retained by the Peo-
ple"?, 37 N. Y. U. L. Rev. 787, Professor Redlich, in advocating
reliance on the Ninth and Tenth Amendments to invalidate the
Connecticut law before us, frankly states:

"But for one who feels that the marriage relationship should be
beyond the reach of a state law forbidding the use of contraceptives,
the birth control case poses a troublesome and challenging problem
of constitutional interpretation. He may find himself saying, 'The
law is unconstitutional—but why?' There are two possible paths to
travel in finding the answer. One is to revert to a frankly flexible
due process concept even on matters that do not involve specific con-
stitutional prohibitions. The other is to attempt to evolve a new
constitutional framework within which to meet this and similar
problems which are likely to arise." *Id.*, at 798.

violates "fundamental principles of liberty and justice," or is contrary to the "traditions and [collective] conscience of our people." He also states, without proof satisfactory to me, that in making decisions on this basis judges will not consider "their personal and private notions." One may ask how they can avoid considering them. Our Court certainly has no machinery with which to take a Gallup Poll.[13] And the scientific miracles of this age have not yet produced a gadget which the Court can use to determine what traditions are rooted in the "[collective] conscience of our people." Moreover, one would certainly have to look far beyond the language of the Ninth Amendment [14] to find that the Framers vested in this Court any such awesome veto powers over law-making, either by the States or by the Congress. Nor does anything in the history of the Amendment offer any support for such a shocking doctrine. The whole history of the adoption of the Constitution and Bill of Rights points the other way, and the very material quoted by my Brother GOLDBERG shows that the Ninth Amendment was intended to protect against the idea that "by enumerating particular exceptions to the grant of power" to the Federal Government, "those rights which were not singled out, were intended to be assigned into the hands of the General Government [the United States], and were con-

---

[13] Of course one cannot be oblivious to the fact that Mr. Gallup has already published the results of a poll which he says show that 46% of the people in this country believe schools should teach about birth control. Washington Post, May 21, 1965, p. 2, col. 1. I can hardly believe, however, that Brother GOLDBERG would view 46% of the persons polled as so overwhelming a proportion that this Court may now rely on it to declare that the Connecticut law infringes "fundamental" rights, and overrule the long-standing view of the people of Connecticut expressed through their elected representatives.

[14] U. S. Const., Amend. IX, provides:

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

sequently insecure." [15]   That Amendment was passed, not to broaden the powers of this Court or any other department of "the General Government," but, as every student of history knows, to assure the people that the Constitution in all its provisions was intended to limit the Federal Government to the powers granted expressly or by necessary implication.  If any broad, unlimited power to hold laws unconstitutional because they offend what this Court conceives to be the "[collective] conscience of our people" is vested in this Court by the Ninth Amendment, the Fourteenth Amendment, or any other provision of the Constitution, it was not given by the Framers, but rather has been bestowed on the Court by the Court. This fact is perhaps responsible for the peculiar phenomenon that for a period of a century and a half no serious suggestion was ever made that the Ninth Amendment, enacted to protect state powers against federal invasion, could be used as a weapon of federal power to prevent state legislatures from passing laws they consider appropriate to govern local affairs.  Use of any such broad, unbounded judicial authority would make of this Court's members a day-to-day constitutional convention.

I repeat so as not to be misunderstood that this Court does have power, which it should exercise, to hold laws unconstitutional where they are forbidden by the Federal Constitution.  My point is that there is no provision

---

[15] 1 Annals of Congress 439.  See also II Story, Commentaries on the Constitution of the United States (5th ed. 1891): "This clause was manifestly introduced to prevent any perverse or ingenious misapplication of the well-known maxim, that an affirmation in particular cases implies a negation in all others; and, e converso, that a negation in particular cases implies an affirmation in all others.  The maxim, rightly understood, is perfectly sound and safe; but it has often been strangely forced from its natural meaning into the support of the most dangerous political heresies." Id., at 651 (footnote omitted).

of the Constitution which either expressly or impliedly vests power in this Court to sit as a supervisory agency over acts of duly constituted legislative bodies and set aside their laws because of the Court's belief that the legislative policies adopted are unreasonable, unwise, arbitrary, capricious or irrational. The adoption of such a loose, flexible, uncontrolled standard for holding laws unconstitutional, if ever it is finally achieved, will amount to a great unconstitutional shift of power to the courts which I believe and am constrained to say will be bad for the courts and worse for the country. Subjecting federal and state laws to such an unrestrained and unrestrainable judicial control as to the wisdom of legislative enactments would, I fear, jeopardize the separation of governmental powers that the Framers set up and at the same time threaten to take away much of the power of States to govern themselves which the Constitution plainly intended them to have.[16]

---

[16] Justice Holmes in one of his last dissents, written in reply to Mr. Justice McReynolds' opinion for the Court in *Baldwin* v. *Missouri*, 281 U. S. 586, solemnly warned against a due process formula apparently approved by my concurring Brethren today. He said:

"I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable. I cannot believe that the Amendment was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions. Yet I can think of no narrower reason that seems to me to justify the present and the earlier decisions to which I have referred. Of course the words 'due process of law,' if taken in their literal meaning, have no application to this case; and while it is too late to deny that they have been given a much more extended and artificial signification, still we ought to remember the great caution shown by the Consti-

I realize that many good and able men have eloquently spoken and written, sometimes in rhapsodical strains, about the duty of this Court to keep the Constitution in tune with the times. The idea is that the Constitution must be changed from time to time and that this Court is charged with a duty to make those changes. For myself, I must with all deference reject that philosophy. The Constitution makers knew the need for change and provided for it. Amendments suggested by the people's elected representatives can be submitted to the people or their selected agents for ratification. That method of change was good for our Fathers, and being somewhat old-fashioned I must add it is good enough for me. And so, I cannot rely on the Due Process Clause or the Ninth Amendment or any mysterious and uncertain natural law concept as a reason for striking down this state law. The Due Process Clause with an "arbitrary and capricious" or "shocking to the conscience" formula was liberally used by this Court to strike down economic legislation in the early decades of this century, threatening, many people thought, the tranquility and stability of the Nation. See, *e. g.*, *Lochner* v. *New York,* 198 U. S. 45. That formula, based on subjective considerations of "natural justice," is no less dangerous when used to enforce this Court's views about personal rights than those about economic rights. I had thought that we had laid that formula, as a means for striking down state legislation, to rest once and for all in cases like *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; *Olsen* v. *Nebraska ex rel. Western Reference & Bond Assn.,* 313 U. S. 236, and many other

tution in limiting the power of the States, and should be slow to construe the clause in the Fourteenth Amendment as committing to the Court, with no guide but the Court's own discretion, the validity of whatever laws the States may pass." 281 U. S., at 595. See 2 Holmes-Pollock Letters (Howe ed. 1941) 267–268.

opinions.[17]  See also *Lochner* v. *New York*, 198 U. S. 45, 74 (Holmes, J., dissenting).

In *Ferguson* v. *Skrupa*, 372 U. S. 726, 730, this Court two years ago said in an opinion joined by all the Justices but one [18] that

"The doctrine that prevailed in *Lochner, Coppage, Adkins, Burns,* and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded.  We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."

And only six weeks ago, without even bothering to hear argument, this Court overruled *Tyson & Brother* v. *Banton*, 273 U. S. 418, which had held state laws regulating ticket brokers to be a denial of due process of law.[19]  *Gold*

---

[17] *E. g.,* in *Day-Brite Lighting, Inc.* v. *Missouri*, 342 U. S. 421, 423, this Court held that "Our recent decisions make plain that we do not sit as a superlegislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare."

Compare *Gardner* v. *Massachusetts*, 305 U. S. 559, which the Court today apparently overrules, which held that a challenge under the Federal Constitution to a state law forbidding the sale or furnishing of contraceptives did not raise a substantial federal question.

[18] Brother HARLAN, who has consistently stated his belief in the power of courts to strike down laws which they consider arbitrary or unreasonable, see, *e. g.,* *Poe* v. *Ullman*, 367 U. S. 497, 539–555 (dissenting opinion), did not join the Court's opinion in *Ferguson* v. *Skrupa*.

[19] Justice Holmes, dissenting in *Tyson*, said:

"I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain." 273 U. S., at 446.

v. *DiCarlo,* 380 U. S. 520.   I find April's holding hard to
square with what my concurring Brethren urge today.
They would reinstate the *Lochner, Coppage, Adkins,
Burns* line of cases, cases from which this Court recoiled
after the 1930's, and which had been I thought totally dis-
credited until now.   Apparently my Brethren have less
quarrel with state economic regulations than former Jus-
tices of their persuasion had.   But any limitation upon
their using the natural law due process philosophy to
strike down any state law, dealing with any activity what-
ever, will obviously be only self-imposed.[20]

In 1798, when this Court was asked to hold another
Connecticut law unconstitutional, Justice Iredell said:

> "[I]t has been the policy of all the *American*
> states, which have, individually, framed their state
> constitutions since the revolution, and of the people
> of the *United States,* when they framed the Federal
> Constitution, to define with precision the objects of
> the legislative power, and to restrain its exercise
> within marked and settled boundaries.   If any act
> of Congress, or of the Legislature of a state, violates
> those constitutional provisions, it is unquestionably
> void; though, I admit, that as the authority to de-
> clare it void is of a delicate and awful nature, the
> Court will never resort to that authority, but in a
> clear and urgent case.   If, on the other hand, the
> Legislature of the Union, or the Legislature of any
> member of the Union, shall pass a law, within the

---

[20] Compare *Nicchia* v. *New York,* 254 U. S. 228, 231, upholding a
New York dog-licensing statute on the ground that it did not "deprive
dog owners of liberty without due process of law."   And as I said con-
curring in *Rochin* v. *California,* 342 U. S. 165, 175, "I believe that
faithful adherence to the specific guarantees in the Bill of Rights in-
sures a more permanent protection of individual liberty than that
which can be afforded by the nebulous standards" urged by my con-
curring Brethren today.

general scope of their constitutional power, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard: the ablest and the purest men have differed upon the subject; and all that the Court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice." *Calder* v. *Bull,* 3 Dall. 386, 399 (emphasis in original).

I would adhere to that constitutional philosophy in passing on this Connecticut law today. I am not persuaded to deviate from the view which I stated in 1947 in *Adamson* v. *California,* 332 U. S. 46, 90–92 (dissenting opinion):

"Since *Marbury* v. *Madison,* 1 Cranch 137, was decided, the practice has been firmly established, for better or worse, that courts can strike down legislative enactments which violate the Constitution. This process, of course, involves interpretation, and since words can have many meanings, interpretation obviously may result in contraction or extension of the original purpose of a constitutional provision, thereby affecting policy. But to pass upon the constitutionality of statutes by looking to the particular standards enumerated in the Bill of Rights and other parts of the Constitution is one thing; to invalidate statutes because of application of 'natural law' deemed to be above and undefined by the Constitution is another. 'In the one instance, courts proceeding within clearly marked constitutional boundaries seek to execute policies written into the Constitution: in the other, they roam at will in the limit-

less area of their own beliefs as to reasonableness and actually select policies, a responsibility which the Constitution entrusts to the legislative representatives of the people.' *Federal Power Commission* v. *Pipeline Co.,* 315 U. S. 575, 599, 601, n. 4." [21]   (Footnotes omitted.)

The late Judge Learned Hand, after emphasizing his view that judges should not use the due process formula suggested in the concurring opinions today or any other formula like it to invalidate legislation offensive to their "personal preferences," [22] made the statement, with which I fully agree, that:

"For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I

---

[21] *Gideon* v. *Wainwright,* 372 U. S. 335, and similar cases applying specific Bill of Rights provisions to the States do not in my view stand for the proposition that this Court can rely on its own concept of "ordered liberty" or "shocking the conscience" or natural law to decide what laws it will permit state legislatures to enact. *Gideon* in applying to state prosecutions the Sixth Amendment's guarantee of right to counsel followed *Palko* v. *Connecticut,* 302 U. S. 319, which had held that specific provisions of the Bill of Rights, rather than the Bill of Rights as a whole, would be selectively applied to the States.   While expressing my own belief (not shared by MR. JUSTICE STEWART) that all the provisions of the Bill of Rights were made applicable to the States by the Fourteenth Amendment, in my dissent in *Adamson* v. *California,* 332 U. S. 46, 89, I also said:

"If the choice must be between the selective process of the *Palko* decision applying some of the Bill of Rights to the States, or the *Twining* rule applying none of them, I would choose the *Palko* selective process."

*Gideon* and similar cases merely followed the *Palko* rule, which in *Adamson* I agreed to follow if necessary to make Bill of Rights safeguards applicable to the States.   See also *Pointer* v. *Texas,* 380 U. S. 400; *Malloy* v. *Hogan,* 378 U. S. 1.

[22] Hand, The Bill of Rights (1958) 70.   See note 5, *supra.*   See generally *id.,* at 35–45.

knew how to choose them, which I assuredly do not." [23]

So far as I am concerned, Connecticut's law as applied here is not forbidden by any provision of the Federal Constitution as that Constitution was written, and I would therefore affirm.

MR. JUSTICE STEWART, whom MR. JUSTICE BLACK joins, dissenting.

Since 1879 Connecticut has had on its books a law which forbids the use of contraceptives by anyone. I think this is an uncommonly silly law. As a practical matter, the law is obviously unenforceable, except in the oblique context of the present case. As a philosophical matter, I believe the use of contraceptives in the relationship of marriage should be left to personal and private choice, based upon each individual's moral, ethical, and religious beliefs. As a matter of social policy, I think professional counsel about methods of birth control should be available to all, so that each individual's choice can be meaningfully made. But we are not asked in this case to say whether we think this law is unwise, or even asinine. We are asked to hold that it violates the United States Constitution. And that I cannot do.

In the course of its opinion the Court refers to no less than six Amendments to the Constitution: the First, the Third, the Fourth, the Fifth, the Ninth, and the Four-

---

[23] *Id.*, at 73. While Judge Hand condemned as unjustified the invalidation of state laws under the natural law due process formula, see *id.*, at 35–45, he also expressed the view that this Court in a number of cases had gone too far in holding legislation to be in violation of specific guarantees of the Bill of Rights. Although I agree with his criticism of use of the due process formula, I do not agree with all the views he expressed about construing the specific guarantees of the Bill of Rights.

teenth. But the Court does not say which of these Amendments, if any, it thinks is infringed by this Connecticut law.

We *are* told that the Due Process Clause of the Fourteenth Amendment is not, as such, the "guide" in this case. With that much I agree. There is no claim that this law, duly enacted by the Connecticut Legislature, is unconstitutionally vague. There is no claim that the appellants were denied any of the elements of procedural due process at their trial, so as to make their convictions constitutionally invalid. And, as the Court says, the day has long passed since the Due Process Clause was regarded as a proper instrument for determining "the wisdom, need, and propriety" of state laws. Compare *Lochner* v. *New York,* 198 U. S. 45, with *Ferguson* v. *Skrupa,* 372 U. S. 726. My Brothers HARLAN and WHITE to the contrary, "[w]e have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Ferguson* v. *Skrupa, supra,* at 730.

As to the First, Third, Fourth, and Fifth Amendments, I can find nothing in any of them to invalidate this Connecticut law, even assuming that all those Amendments are fully applicable against the States.[1] It has

---

[1] The Amendments in question were, as everyone knows, originally adopted as limitations upon the power of the newly created Federal Government, not as limitations upon the powers of the individual States. But the Court has held that many of the provisions of the first eight amendments are fully embraced by the Fourteenth Amendment as limitations upon state action, and some members of the Court have held the view that the adoption of the Fourteenth Amendment made every provision of the first eight amendments fully applicable against the States. See *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion of MR. JUSTICE BLACK).

not even been argued that this is a law "respecting an establishment of religion, or prohibiting the free exercise thereof." [2] And surely, unless the solemn process of constitutional adjudication is to descend to the level of a play on words, there is not involved here any abridgment of "the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." [3] No soldier has been quartered in any house.[4] There has been no search, and no seizure.[5] Nobody has been compelled to be a witness against himself.[6]

The Court also quotes the Ninth Amendment, and my Brother GOLDBERG's concurring opinion relies heavily upon it. But to say that the Ninth Amendment has anything to do with this case is to turn somersaults with history. The Ninth Amendment, like its companion the Tenth, which this Court held "states but a truism that all is retained which has not been surrendered," *United States* v. *Darby*, 312 U. S. 100, 124, was framed by James Madison and adopted by the States simply to make clear that the adoption of the Bill of Rights did not alter the plan that

---

[2] U. S. Constitution, Amendment I. To be sure, the injunction contained in the Connecticut statute coincides with the doctrine of certain religious faiths. But if that were enough to invalidate a law under the provisions of the First Amendment relating to religion, then most criminal laws would be invalidated. See, *e. g.*, the Ten Commandments. The Bible, Exodus 20:2–17 (King James).

[3] U. S. Constitution, Amendment I. If all the appellants had done was to advise people that they thought the use of contraceptives was desirable, or even to counsel their use, the appellants would, of course, have a substantial First Amendment claim. But their activities went far beyond mere advocacy. They prescribed specific contraceptive devices and furnished patients with the prescribed contraceptive materials.

[4] U. S. Constitution, Amendment III.

[5] U. S. Constitution, Amendment IV.

[6] U. S. Constitution, Amendment V.

the *Federal* Government was to be a government of ex-
press and limited powers, and that all rights and powers
not delegated to it were retained by the people and the
individual States. Until today no member of this Court
has ever suggested that the Ninth Amendment meant
anything else, and the idea that a federal court could
ever use the Ninth Amendment to annul a law passed by
the elected representatives of the people of the State of
Connecticut would have caused James Madison no little
wonder.

What provision of the Constitution, then, does make
this state law invalid? The Court says it is the right of
privacy "created by several fundamental constitutional
guarantees." With all deference, I can find no such gen-
eral right of privacy in the Bill of Rights, in any other part
of the Constitution, or in any case ever before decided by
this Court.[7]

At the oral argument in this case we were told that the
Connecticut law does not "conform to current community
standards." But it is not the function of this Court to
decide cases on the basis of community standards. We
are here to decide cases "agreeably to the Constitution and
laws of the United States." It is the essence of judicial

---

[7] Cases like *Shelton* v. *Tucker,* 364 U. S. 479 and *Bates* v. *Little
Rock,* 361 U. S. 516, relied upon in the concurring opinions today,
dealt with true First Amendment rights of association and are wholly
inapposite here. See also, *e. g., NAACP* v. *Alabama,* 357 U. S. 449;
*Edwards* v. *South Carolina,* 372 U. S. 229. Our decision in *McLaugh-
lin* v. *Florida,* 379 U. S. 184, is equally far afield. That case held
invalid under the Equal Protection Clause, a state criminal law which
discriminated against Negroes.

The Court does not say how far the new constitutional right of
privacy announced today extends. See, *e. g.,* Mueller, Legal Regula-
tion of Sexual Conduct, at 127; Ploscowe, Sex and the Law, at 189.
I suppose, however, that even after today a State can constitutionally
still punish at least some offenses which are not committed in public.

duty to subordinate our own personal views, our own ideas of what legislation is wise and what is not. If, as I should surely hope, the law before us does not reflect the standards of the people of Connecticut, the people of Connecticut can freely exercise their true Ninth and Tenth Amendment rights to persuade their elected representatives to repeal it. That is the constitutional way to take this law off the books.[8]

---

[8] See *Reynolds* v. *Sims,* 377 U. S. 533, 562. The Connecticut House of Representatives recently passed a bill (House Bill No. 2462) repealing the birth control law. The State Senate has apparently not yet acted on the measure, and today is relieved of that responsibility by the Court. New Haven Journal-Courier, Wed., May 19, 1965, p. 1, col. 4, and p. 13, col. 7.