Willie R. SMITH, Plaintiff,

v.

Everett E. PRICE, Chief of Police, Athens, Georgia, and City of Athens Personnel Board, City of Athens, Georgia, Defendants.

Civ. A. No. 77–39–Ath.

United States District Court,
M. D. Georgia,
Macon Division.

Sept. 21, 1977.

James W. Smith, Athens, Ga., for plaintiff.

Denny C. Galis, Athens, Ga., for defendants.

OWENS, District Judge:

Employees of the City of Athens, Georgia, are subject to Merit System Rules and Regulations which provide grounds for dismissal. Police officers of the city are also subject to eighteen (18) single-spaced typewritten pages of rules and regulations last promulgated September 3, 1976, which contain many grounds for dismissal.

Plaintiff Willie R. Smith, an Athens police officer since January 15, 1972, was dismissed on June 10, 1977, for violation of these rules and regulations. After appealing to the City of Athens Personnel Board and losing, he filed this lawsuit alleging that in dismissing him the defendant Chief of Police and Personnel Board deprived him of rights guaranteed by the First, Fifth, and Fourteenth Amendments to the Constitution of the United States. He prayed for injunctive relief to include a declaration that such rules and regulations are unconstitutional, direction to the defendants to reinstate him as a police officer and an order that he receive back pay, allowances and attorney's fees. The defendants vigorously deny that these rules and regulations are unconstitutional and further deny that his dismissal is in any way constitutionally or legally invalid.

The question of permanent injunctive relief was heard on August 10, 1977. Evidence, briefs and arguments of counsel having been heard, this constitutes the court's findings of fact and conclusions of law. Rule 65, Federal Rules of Civil Procedure.

Officer Smith on February 8, 1976, was married and living in the adjoining county of Oconee. On that date while off duty and out of uniform, he visited the woman with whom he was having an extra-marital affair, in her apartment in Athens and while there was shot by the woman's former lover. Following an investigation he was suspended for ten (10) days by Chief Price who stated as a reason for that action:

"You are hereby suspended for a period of 10 working days for the violation of the Departmental Rules and Regulations, Section 101.48. A copy of the Internal Affairs Investigation Report is attached for your information. As per to our discussion of this date *any further violation of the departmental rules and regulations will lead to dismissal.*" Plaintiff's Exhibit "1" at 12. (Emphasis supplied).

Section 101.48 of the regulations concerned conduct unbecoming an officer.

On June 8, 1977, Chief of Police Price received a telephone call from the woman with whom plaintiff Smith was having an affair in February 1976. She advised that the affair had continued and told of many personal difficulties between her, Officer Smith and Officer Smith's wife. Until the receipt of this telephone call the defendant police chief and city officials were unaware

of plaintiff Smith's post-February 1976 extra-marital conduct. As his personnel file and the evidence show, he was then considered to be generally satisfactory and in some respects an outstanding police officer.

Chief Price directed Major Wallace to investigate the situation. He did, and based upon what the plaintiff, his wife and his girlfriend freely and voluntarily said, Major Wallace reported:

"TO: Everett E. Price, Chief of Police
"FROM: Mark Wallace, Uniform Division Commander
"SUBJECT: Internal Investigation; Officer Willie R. Smith
"OFFENSE: Failure to adhere to and abide by:

1. Departmental General Order 76–4—Rules and Regulations: Section I.A and I.Af—Rules Governing Orders and Commands:

2. Section II.A, II.A1 and II.A2—Professional Conduct of Departmental Members;

3. Section II.E—Professional Conduct of Departmental Members (Members are Prohibited);

4. Section III.F—Responsibilities of Members;

5. General Order 76–4—Conduct Unbecoming an Officer;

6. City of Athens Merit System: Section VIII A 1.f.(1), (6), and (9).

"DATE: June 8, 1977

BASIS FOR INVESTIGATION:

On June 8, 2977 (sic), Miss _____ * contacted Chief Price telephonically and alleged misconduct on Willie Smith's part directed toward her, to include physical assualt (sic) and forceful threats.

SYNOPSIS:

Investigation disclosed that Officer Willie Smith has had an affair with Miss _____ for a period of more than three (3) years. During this time Officer Smith was shot three (3) times in Miss _____ apartment on February 8, 1976 by a boyfriend of Miss _____. As a result of that incident Officer Smith was suspended for a ten (10) day period and advised in writing that other such misconduct would result in his dismissal.

Since the above incident, Officer Smith has repeatedly visited Miss _____ in her residence while he was on a duty tour, not concerned with official Police business and without reporting his location to the dispatcher or shift command, all in violation of Departmental General Orders. During these visits Miss _____ alleges Officer Smith has physically assaulted, verbally threatened, and on several occasions drawn his departmental issued service revolver on her to enforce his threats. The last such incident being less than two weeks prior to this date.

Miss _____ visited Officer Smith's residence in Oconee County on June 7, 1977 and removed his departmental issued gun belt and service revolver from his private vehicle. Miss _____ fired Officer Smith's service revolver six times, three rounds of which struck Officer Smith's private vehicle and upon leaving the premises Miss _____ took the departmental issued gun belt and revolver with her. Officer Smith failed to report the above in violation of Departmental General Orders.

CONCLUSIONS:

That Officer Willie R. Smith has maintained an affair with Miss _____ for a period of approximately three years. That Officer Smith renewed this affair approximately one month after he was shot in her apartment in violation of Departmental Rules & Regulations I. A. and I. A. 4.—Rules Governing Orders and Commands.

That Officer Smith has visited Miss _____ at her residence in an on duty status, not on official business, on several occasions without advising the dispatcher or shift supervisors of his whereabouts in violation of Departmental Rules & Regulations II. E. 6.—Responsibilities of Members (members are prohibited).

That Officer Smith failed to report Miss _____ taking his gun and gunbelt from his privately owned vehicle in violation of

Departmental Rules & Regulations III. F.—Responsibility of Members.

That Officer Smith stated before the Promotion Review Committee that he was not 'running around' on his wife in violation of Departmental Rules & Regulations II. A., II. A. 1. and II. A. 2. The Officer Smith's involvement with Miss _____ is in violation of general order 76–4 Rules & Regulations—Conduct Unbecoming an Officer and City of Athens Merit System Section VIII A. 1. f. (1), (6), (9)." Plaintiff's Exhibit 6.
 * Name omitted.

Chief Price dismissed Officer Smith for the reasons suggested by Major Wallace.

The Rules and Regulations of the Athens Police Department referred to in Major Wallace's report provide:

> "DEPARTMENTAL GENERAL ORDER 76–4
> ATHENS POLICE DEPARTMENT
> ISSUED:
> 3 September 1976
> Index as:
> Conduct of Members
> Responsibilities of Members
> Rules and Regulations

---

### RULES AND REGULATIONS

The purpose of this General Order is to establish and maintain definite Rules, Regulations, and Responsibilities applicable to all members of the City of Athens Police Department. The material below is *NOT ALL INCLUSIVE*, since every appropriate action or every possible violation a member may make is impossible to include within one Manual. Any violation(s) not specifically enumerated in this Manual or other Departmental directives which warrants disciplinary action shall be documented and classified as "Conduct Unbecoming an Officer/Member" and the appropriate disciplinary action shall be pursued by the Department.

I. RULES GOVERNING ORDERS AND COMMANDS
 A. Member *SHALL* recognize and adhere to all General Orders, Memorandums, Special Circulars, and any other Order(s) printed upon authorized Departmental Stationery and signed by the Chief of Police or the Chief's designated Command Officer(s). All of the above shall have the complete force and effect of a Departmental General Order.

 * * * * * *

4. Failure to obey or deliberate refusal to obey a lawful order(s) or command(s) issued by a Command or Supervisory Officer(s) is *INSUBORDINATION* and the violating member will be subject to dismissal.

 * * * * * *

II. PROFESSIONAL CONDUCT OF DEPARTMENTAL MEMBERS
 A. Members *SHALL* conduct their professional, public, and private lives and activities in such a manner as to prohibit conveying an image of *DISREPUTE* on the Department or the individual member(s).
 1. Members shall always conduct themselves in a professional, responsible, and accountable manner.
 2. Members shall maintain a loyalty to the Department consistent with all laws and Department Rules. A sincere loyalty to the Department is an important element in developing and maintaining Departmental morale and discipline.

 * * * * * *

E. Members are *PROHIBITED* from engaging in the following activities during a tour of duty unless the below stated exceptions are applicable.
 1. Carrying umbrellas, newspapers, or other non-police related articles except to accomplish a specific police function. General, items of the above categories are prohibited unless the member is participating in a special operation.
 2. Recreational or non-police related reading except when the member is properly logged out of service on a meal or coffee break.
 3. *SLEEPING.*

4. Drinking intoxicating beverages except in the performance of a specific police function and then *NEVER IN UNIFORM.* (See General Order 76–16 of this manual).

5. Games of chance, card playing, or gambling, except to accomplish a specific police function and with the expressed authorization of a higher authority and then *NEVER IN UNIFORM.*

6. Loitering in any public or private business or other location except to accomplish a specific police function. This rule applied to members when they are in uniform whether on or off a tour of duty.

III. RESPONSIBILITIES OF MEMBERS

\* \* \* \* \* \*

F. Members are responsible for utilizing Departmental equipment only for the intended purpose of the particular equipment and within established Departmental Procedures. Additionally, members shall make every effort to conserve the resources of the Department and shall not willfully or negligently damage City of Athens property or equipment."

Plaintiff's Complaint, Exhibit "C" at 1, 3, 10 and 12.

The Merit System Rules referred to provide:

"Section VIII—*Separation and Disciplinary Action*

A. *Separations*

1. *Types of Separation*

\* \* \* \* \* \*

(f) *Dismissal*—An employee covered under the provisions of this plan may be dismissed for cause when alternative personnel actions (reprimand, suspension, demotion, etc.) would not be deemed sufficient, appropriate or in the best interest of the City service.

1. Failure to meet prescribed standards of work, morality, and ethics, to an extent that makes an employee unsuitable for any kind of employment in the City's service.

\* \* \* \* \* \*

6. Intoxication on duty from intoxicating liquor, malt beverage, wine, or other similar beverage, or drug abuse, or drunkenness, or other immoral conduct incompatible with the service of the City.

\* \* \* \* \* \*

9. Failure to comply with published rules, regulations, or ordinances of the City or any department thereof."

Plaintiff's Complaint, Exhibit "D".

As is shown by Major Wallace's testimony and the rules and regulations referred to, Major Wallace's first conclusion in reality is that Officer Smith disobeyed Chief Price's February 1976 direct order to cease his extra-marital affair which Chief Price deemed to be in violation of rules then describing Conduct Unbecoming an Officer. The Major's second conclusion is that Officer Smith on several occasions while on duty stopped by his girl friend's apartment, talked for a few minutes and/or went to the bathroom and this constituted loitering. The third conclusion is that the temporary taking of Officer Smith's gun from his car in Oconee County by his girl friend, should have been reported to the police department because it was a misutilization of department property and a theft of department property. The fourth conclusion is that when Officer Smith appeared unsuccessfully before the promotion board in March 1977 he lied when in response to the board's questions, he said he was not "running around" on his wife and thereby conveyed an image of disrepute on the department or himself. In addition Major Wallace further concluded this indicates unprofessional, irresponsible conduct and a lack of loyalty to the department. Major Wallace's final conclusion is that Officer Smith's affair constituted conduct unbecoming an officer and further violated prescribed standards of morality, was immoral conduct incompatible with city service, and amounted to failure to comply with rules and regulations.

From Major Wallace's testimony and all the other evidence, including particularly testimony of Chairman Jones of the Personnel Board, the court finds that the sole cause of Officer Smith's dismissal was his continuing to have an extra-marital affair after being commanded by Chief Price to refrain from doing so. The other conclusions were inserted by Major Wallace and adopted by Chief Price only to buttress this principal conclusion; in and of themselves they would not have been cause for dismissal. Neither Chief Price nor the Personnel Board would have decided to dismiss him for those reasons had he not continued to run around on his wife. *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

■ Police officers of the City of Athens and all other city employees are possessed of and entitled to enjoy the same constitutional rights and privileges that all other persons in these United States possess and enjoy. Among those constitutional rights and privileges is the First Amendment right of freedom of speech. "The First Amendment guarantees freedom of expression in a wide variety of relationships and conditions. But a fundamental area in which this constitutional freedom is recognized is in the right of association. . ." *Rampey v. Allen,* 501 F.2d 1090, 1097 (10th Cir. 1974). This right of association includes the "freedom to associate and privacy in one's associations" *NAACP v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 1172; 2 L.Ed.2d 1488, 1499, in many different areas of life. As the Supreme Court said in finding that this zone of privacy encompassed the marital relationship:

> The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. See *Poe v. Ullman,* 367 U.S. 497, 516–522, 81 S.Ct. 1752, 6 L.Ed.2d 989, 1003–1007 (dissenting opinion). Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The

Third Amendment in its prohibition against the quartering of soldiers "in any house" in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

The Fourth and Fifth Amendments were described in *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746, 751, as protection against all governmental invasions "of the sanctity of a man's home and the privacies of life." We recently referred in *Mapp v. Ohio,* 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 1090, 84 A.L.R.2d 933, to the Fourth Amendment as creating a "right to privacy, no less important than any other right carefully and particularly reserved to the people." See Beaney, The Constitutional Right to Privacy, 1962 Sup.Ct.Rev. 212; Griswold, The Right to be Let Alone, 55 Nw.U.L.Rev. 216 (1960).

\* \* \* \* \* \*

We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

*Griswold v. Connecticut,* 381 U.S. 479 at 484–86, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 at 514–516 (1965).

 State governmental bodies may not require employees to give up their constitutional rights as a condition of obtaining or continuing public employment unless there is a justification for doing so. As to policemen and their private off-duty conduct, for a state governmental body to justify controlling their private off-duty conduct the state governmental body must show that the employee's usefulness as a police officer would be substantially and materially impaired by the conduct in question. *Battle v. Mulholland*, 439 F.2d 321 (5 Cir. 1971).

 Here the plaintiff police officer was required[1] by the defendant officials to tell of his private, off-duty marital misconduct which in no way had affected the performance of his duties and which had not publicly reflected adversely upon the public image of the plaintiff as a police officer or of the police department as a public body. Given the opportunity to do so, the defendant police and city officials offered *no evidence* that shows marital misconduct engaged in privately and while off-duty has any effect upon a police officer's duty performance. They disapprove—as most citizens do—of police officers running around on their wives. They do not even suggest that this disapproved of conduct generally impairs the performance of a police officer's duty or specifically impaired this police officer's duty performance. There is thus no justification for these police officials requiring this police officer to

---

1. Merit Rule VIII, A 1 (f), also states as reasons for dismissal:

"11. Willfully and falsely stating a material fact: (a) In obtaining employment; (b) with respect to seeking promotion or other advantage, or thing of value for employee or another; (d) with respect to official conduct or performance of duty by employee or another.

\* \* \* \* \* \*

13. When duly and properly called as a witness before any municipal government, personnel board, state or federal judicial or administrative tribunal, and while before such tribunal by failing to answer any proper question concerning the performance of his official duties with the City." Plaintiff's Complaint, Exhibit "D".

Police Department Rule II D provides:

"7. Members are required and directed to answer all questions, render all relevant knowledge and material, and/or submit to a polygraph examination upon request or order of the Chief of Police, if the member is advised that he or she is suspected of:

a. Misconduct that would be a foundation for termination, suspension, or other forms of disciplinary action approved by the City of Athens Merit System and the department.

b. Not being qualified for continued employment with the department.

8. Members shall submit to any medical, ballistic, chemical or other test, photograph lineup or any other investigative aid designated by the Chief of Police when the member(s) is advised that he/she is suspected of the above (i. e. II. D. 7). Such investigative aids shall be specifically related to a definite investigative (sic) being conducted by the department.

*NOTE*: ALL QUESTIONS WILL BE LIMITED IN SCOPE TO ACTIVITIES, CIRCUMSTANCES, AND EVENTS WHICH PERTAIN TO THE MEMBER'S CONDUCT, ACTS, OR KNOWLEDGE WHICH MAY FORM THE BASIS FOR DISCIPLINARY ACTION IN ONE OF THE TWO CATEGORIES ABOVE. HOWEVER, IN THE COURSE OF A POLYGRAPH EXAMINATION FOR ESTABLISHING CONTROLS AND PROPER RESPONSE MEASUREMENT LEVELS, IRRELEVANT QUESTIONS MAY BE ASKED SO LONG AS SUCH QUESTIONS PERTAIN TO MATTERS WHOLLY BEYOND THE SCOPE OF THE INVESTIGATION AND WHOSE ANSWERS CAN EASILY BE VERIFIED INDEPENDENTLY OF THE ANSWERS INTERROGATED. A MEMBER DOES NOT HAVE A RIGHT TO THE ASSISTANCE OF COUNSEL DURING QUESTIONING OR A POLYGRAPH EXAMINATION, OR BOTH PURSUANT TO THIS RULE. QUESTIONING UNDER EITHER METHOD SHALL BE COMPLETED WITHIN A REASONABLE TIME AND UNDER CIRCUMSTANCES DEVOID OF INTIMIDATION OR UNDUE CORRECTION. THE DEPARTMENT RECOGNIZES THAT, FOR PURPOSES OF CRIMINAL PROSECUTION, MEMBERS DO NOT AUTOMATICALLY WAIVE THEIR CONSTITUTIONAL PRIVILEGE AGAINST SELF–INCRIMINATION DURING QUESTIONING OR POLYGRAPH EXAMINATIONS PURSUANT TO THIS RULE. A MEMBER FAILING TO OBEY AN ORDER OR REQUEST PURSUANT TO THIS RULE MAY BE DISMISSED OR BE SUBJECT TO OTHER DISCIPLINARY ACTION."

Plaintiff's Complaint, Exhibit "C" at 9, 10. These rules in effect compel an employee to give up his right under the Fifth Amendment to remain silent and say nothing that would incriminate him. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

cease running around on his wife as a condition of being an employee of the Athens Police Department. Constitutionally when off duty and out of uniform he can do privately what he wishes to do [2] until such time as it materially and substantially impairs his usefulness as a police officer.

■ Public officials in adopting regulations which have the effect of controlling constitutionally protected conduct which does materially and substantially impair a police officer's usefulness are also constitutionally prohibited from making them vague and unnecessarily broad. As explained in *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971), an appeal from this court as to the validity of rules and regulations of the City of Macon:

> At least as early as 1940, in response to the favored status of rights to expression and association in our constitutional scheme, the Supreme Court developed what has become known as the overbreadth doctrine. *See, e. g., Cantwell v. Connecticut*, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; *Thornhill v. Alabama*, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. This method of adjudication, wherein the courts review a particular law on its face without regard to the constitutional status of a particular claimant's conduct, is based on the principle that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Zwickler v. Koota*, 1967, 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444, quoting *NAACP v. Alabama ex rel. Flowers*, 1964, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325. Facial overbreadth scrutiny emphasizes the need to eliminate an overbroad law's deterrent impact on constitutionally protected expressive activity. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, *supra*. "Chilling effect" is a short-hand way of describing this vice of an overbroad law. Since by definition an overbroad statute covers some privileged as well as non-privileged activity, the statutory burden operates as a disincentive to action and creates an *in terrorem* effect on conduct within the protection of the First Amendment. In the area of speech, the vagueness doctrine, based upon the principle that a statute must not forbid or require "the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. General Constr. Co.*, 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322, reflects this same concern. Lack of fair warning to actors or lack of adequate standards to guide enforcers also may lead to a "chill" on privileged activity. A person contemplating action who might be covered by a vague statute is left in doubt as to whether he is covered by the statute and, if so, whether his claim of privilege will be upheld. *See, e. g. NAACP v. Button*, 1963, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405. *See also Coates v. Cincinnati*, 1971, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214.
>
> Rather than await case-by-case excision of a statute's overbreadth or vagueness through review of its application to particular conduct, which would be needlessly time-consuming and ineffective, courts, under the rubric of the overbreadth doctrine, invalidate the statute facially so as to end its deterrence of constitutionally protected activity. *Simply to review a statute as applied to the conduct of a particular claimant, while it might permit that individual to escape the statutory burden, would permit the overbroad law to remain as a deterrent to others who, because of fear of statutory reprisals, might forego protested activity rather than test their privilege administratively or judicially.*
>
> The overbreadth doctrine, therefore, focuses directly on the need for precision in legislative draftsmanship to avoid conflict

---

**2.** This, of course, does not mean that he may violate other laws, rules or regulations not herein considered and be immune from prosecution.

with First Amendment rights. Even though the interests a statute promotes may justify some infringement upon First Amendment rights, the overbreadth doctrine condemns those means to that legitimate end which comprehend too broad an incursion upon the realm of First Amendment activity. Where a law is substantially overbroad, in that it sweeps within its scope a wide range of both protected and non-protected expressive activity, and where no "readily apparent construction suggests itself as a vehicle for rehabilitating the statute in a single [proceeding]," *Dombrowski v. Pfister, supra,* 380 U.S. at 491, 85 S.Ct. at 1123, courts have rejected simple interest balancing and have required the legislature to achieve its ends by "less drastic means." *Shelton v. Tucker,* 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231; *accord, United States v. Robel,* 1967, 389 U.S. 258, 268 n. 20, 88 S.Ct. 419, 19 L.Ed.2d 508.

*Id.* at 459, 460. (emphasis added).

The court has carefully examined the merit rules as to dismissal and the entire rules and regulations of the Athens Police Department.

■ The court notes particularly that dismissal may occur—indeed did occur—for "1. Failure to meet prescribed standards of . . . morality and ethics . . ." It may also occur for "4. Insubordination constituting a serious breach of discipline . . ." and for "11. Willfully and falsely stating a material fact . . . with respect to official conduct or performance of duty by employee or another."

The obvious vagueness and broadness of these rules in their entirety is illustrated by the generally accepted meaning of the words "morality" and "ethics", to wit:

"morality . . . 1. Knowledge of moral principles, moral wisdom.

2. Moral quality or character; righteousness; virtue.

3. That which conveys or instills moral lessons or expresses moral sentiment; specif.: a A moral tale or writing; also, its moral. b Moral inference, meaning, or lesson, moral, or moral sense, as of a story. c Moralizing; sermonizing.

4. The science, or a system, of morals, also, ethical principles or doctrines, as of a man or system.

5. Moral practice or action; recitude of life; morals; conformity to the mores of a particular time and place. Cf. VIRTUE, 2.

6. The quality of that which conforms to right ideals or principles of human conduct, of that which is based upon or derived from such principles; as to admit the expediency of a law but to question its *morality.*

7. A kind of allegorical play, so termed because it consisted typically as discourses in praise of morality between actors representing such characters as Charity, Faith, Death, Vice, etc.; a dramatization of an allegory.

"ethics . . . 1. A treatise on morals; specif., the ethical works of Aristotle, known to us in three treatises; the *Nicomachean Ethics,* probably published by Aristotle's son Nichomachus; the *Eudemian Ethics,* supposed to have been prepared by Aristotle's pupil Eudemus; and the *Magna Moralia,* probably an abstract from the preceding.

2. The science of moral duty; more broadly, the science of the ideal human character and the ideal ends of human action. The chief problems with which ethics deals concern the nature of the summum bonum, or highest good, the origin and validity of the sense of duty, and the character and authority of moral obligation. The principal ethical theories are: First, such as consider happiness to be the greatest good; these may be egoistic, as is usually the case with hedonistic and eudaemonistic theories, or altruistic, as utilitarianism. Second, theories of perfectionism, or self-realization. Third, theories resting upon the relation of man to the universe or to devine law, as Stoicism, evolutionism, Christian ethics. Intuitionism and empiricism in ethics are doctrines opposed with respect to the character of the sense of duty. Absolute

*ethics* affirms an unchanging moral code; relative *ethics* regards moral rules as varying with human development.

3. Moral principles, quality, or practice; a system of moral principles; as, social *ethics*; medical *ethics*; professional *ethics* forbids him; the morals of individual action or practice; as, the *ethics* of a conscientious man."

Webster's New International Dictionary, 2nd Ed.

It is further illustrated by the fact that an employee is told that not all insubordination ("not submitting to authority; disobedient, mutinous"—Webster's New International Dictionary, 2nd Ed.) is prohibited; instead only "insubordination constituting a serious breach of discipline" is prohibited. It is even better illustrated by the prohibition against "wilfully and falsely stating [speaking or saying] a material fact . . with respect to official conduct or performance of duty by employee or another." Obviously these vague terms could be applied to anything city employees do or say on or off the job seven days a week. How could a conscientious employee read them and know with any precision of the conduct that is required of him?

The police department rules and regulations—18 pages—are even more vague and broader. The beginning paragraph sets the stage—"The material below is *not all inclusive* . . . Any violation(s) not specifically enumerated in this Manual or other departmental directives which warrants disciplinary action shall be documented and classified as 'Conduct Unbecoming an Officer/Member' and the appropriate disciplinary action shall be pursued by the Department." This in effect says that anything you do that is not covered by these 18 pages may be something the police department disapproves of and that will be termed "Conduct Unbecoming An Officer/Member."

The remainder of the eighteen (18) pages is consistently vague, *i. e.*:

I. A. 5. Members shall not ridicule or criticize any other member or any decision(s) made by another member except as criticism may be appropriate to properly instruct a subordinate in the line of duty with constructive criticism.

6. Members shall not ridicule or criticize a Command or Supervisory Officer(s) or any decision(s) made by the above, whether in or out of the Superior's presence, unless the criticism is conducted in the line of duty and necessary to properly review the subject matter.

Can police members or officers speak of what their fellow members or officers do? Can police officers speak of what Chief Price does or fails to do? Apparently not without fear that what they say will be considered ridicule or criticism.

"II A. Members *SHALL* conduct their professional, public and private lives and activities in such a manner as to prohibit conveying an image of *DISREPUTE* . . . ."

What is an image of disrepute?

"B. 1. Members shall not knowingly become involved with or a member of any subversive organization or group . . ."

Does this include the League of Women Voters, the NAACP, a labor union, the American Civil Liberties Union, the Democratic Party?

"4. Members . . . shall not engage in the following political activities . . . d. Take part in a political campaign."

Can an Athens policeman display a "Carter for President" bumper sticker on his private auto or discuss with a friend his personal preference for President, Senator, or Representative?

"12. Members shall not maliciously gossip . . .?

"15. Members shall not forward any official written communication concerning Departmental affairs . . ."

"C. 5 Members shall not recommend or suggest . . . the employment of or the name of any business, service, or tradesman."

The City of Athens may regulate the conduct of its employees but it may not do

so in such an imprecise, broad, vague manner. *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971). Since each and every part of these regulations suffers from this defect, they are all unconstitutional and may no longer be used by the City of Athens to regulate the conduct of its employees.

The plaintiff having been discharged pursuant to unconstitutionally broad, vague rules and regulations and having been discharged for engaging in constitutionally protected conduct, is entitled to be reinstated in his employment and to receive as back pay the wages and allowances he would have received had he not been dismissed. He is further entitled to an award of attorney's fees.

For all of the aforesaid reasons the defendants are enjoined from further using the merit rules pertaining to dismissal and the entire rules and regulations of the police department to regulate the conduct of the plaintiff or any other person. They are further enjoined from refusing to reinstate plaintiff and from paying him all back pay and allowances that he would have received had he not been dismissed. Such injunction shall continue until further order of the court.

Plaintiff's attorneys may make application for a determination of the amount of attorney's fees to be awarded.