**Richard BRIGGS, Plaintiff,**

v.

**NORTH MUSKEGON POLICE DEPARTMENT, City of North Muskegon and City Commissioners and Police Chief, Defendants.**

**No. G80–96 CA6.**

United States District Court,
W.D. Michigan, S.D.

May 5, 1983.

Jeffrey T. Ross, Logan & Ross, Grand Rapids, Mich., for plaintiff.

Harry J. Knudsen, Knudsen, Wasiura & Associates, P.C., Muskegon, Mich., for defendant.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This is an action pursuant to 42 U.S.C. § 1983 seeking compensatory and punitive damages for the allegedly unlawful dismissal of plaintiff from his job as a police officer with the defendant police department. The parties are in agreement that the reason for the dismissal was that plaintiff, a married man, was cohabiting with a married woman not his wife. Plaintiff claims that the dismissal violated his associational and privacy rights protected by the United States Constitution, and that he was treated differently from other individuals who were similarly situated. This matter was tried before the Court, and this Opinion shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52.

Plaintiff commenced his employment as a part-time police officer in 1969, and it is undisputed that he performed his duties satisfactorily up to the time of his suspension on February 15, 1977. The events leading up to his suspension began with his separation from his wife in January, 1977.[1] Plaintiff and Cynthia Secrest moved in February, 1977 into an apartment located about one block from the main business center of North Muskegon. The city is a small residential community located on a

---

1. Plaintiff was subsequently divorced in October, 1977, and his cohabitant was divorced in June or July of 1977.

peninsula containing about one and a half square miles with a population of about 4,000. Plaintiff admits that their cohabitation relationship included the sharing of sexual intimacies. It was plaintiff himself who brought his new living arrangements to the attention of Police Chief Harold Mirkle. The City Council then directed the City Superintendent to order Police Chief Mirkle to place plaintiff on suspension. On February 15, 1977 plaintiff was suspended, in the words of the Superintendent's memo to the Chief, "until such time it is decided his actions are not unbecoming a police officer for the City of North Muskegon."

On July 1, 1977, plaintiff was informed that he was terminated retroactive to the date of suspension and that he would be afforded a hearing. Plaintiff was duly notified of a hearing before the City Council which was conducted on August 29, 1977. At the hearing, plaintiff admitted that he was still cohabiting with Ms. Secrest within the city and was informed by the City Attorney that there was a state statute relating to illegal cohabitation.[2] Plaintiff presented a prepared statement expressing his opinion that such statute was antiquated and unenforceable. Plaintiff also informed the City Council that he intended to continue cohabiting with Ms. Secrest. On September 19, 1977, the Council voted to deny plaintiff's request for reinstatement.

Plaintiff contends that defendants' acts have intruded upon his constitutionally-guaranteed rights of privacy and association. He further contends that such intrusion is unjustified because defendants have failed to demonstrate even a rational relationship between plaintiff's private, off-duty living arrangements and the performance of his duties. Plaintiff also asserts that he was treated differently than another individual who allegedly was engaging in the same course of conduct. Defendants argue that the dismissal was justified because plaintiff's off-duty conduct adversely affected or had the potential to adversely affect his performance on the job, and because local law enforcement officers can be required as a condition of their employment to conform their conduct to the requirements of the law.

A constitutionally guaranteed right to free association has been inferred by the Supreme Court from the First Amendment protection of speech and assembly, *NAACP v. Alabama,* 357 U.S. 449, 460–63, 78 S.Ct. 1163, 1170–72, 2 L.Ed.2d 1488 (1958), and a right of privacy has been found in several provisions of the Constitution, *Griswold v. Connecticut,* 381 U.S. 479, 484–86, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965). Where these rights come into conflict with interests of state and local governments the legitimate rights of the parties must be reconciled in a manner that is consistent with the Constitution. When the state acts as an employer, it may not without substantial justification condition employment on the relinquishment of constitutional rights, *see Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), but it has greater latitude in restricting the activities of its employees than of its citizens in general. *Kelley v. Johnson,* 425 U.S. 238, 245, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976). Whether the private activities of a public employee can constitute valid grounds for dismissal requires careful consideration of both the interests of the individual and the interests of the government.[3]

---

**2.** M.C.L.A. § 750.335 provides as follows:

Any man or woman, not being married to each other, who shall lewdly and lasciviously associate and cohabit together, and any man or woman, married or unmarried, who shall be guilty of open and gross lewdness and lascivious behavior, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than 1 year, or by fine of not more than $500.00. No prosecution shall be commenced under this section after 1 year from the time of committing the offense.

Defendants also point to the statutory prohibition of adultery, but the scope of the state's interest in such conduct is defined as limited to situations in which there is a complaint from the spouse, which did not occur here. *See* M.C.L.A. § 750.31.

**3.** *See generally* Note, Application of the Constitutional Privacy Right to Exclusions and Dis-

The right of privacy upon which plaintiff relies was the basis in *Griswold* for holding unconstitutional a statute prohibiting the use of contraceptives. A number of specific guarantees in the Bill of Rights were found to have penumbras that create a zone of privacy which encompasses the marital relationship. The result was extended to unmarried persons in *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) on equal protection grounds, and the Court went on to declare:

> It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

405 U.S. at 453, 92 S.Ct. at 1038 (emphasis in original). The constitutional right of privacy includes "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–877, 51 L.Ed.2d 64 (1977). Although the outer limits of this right have not been established, "it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions 'relating to marriage, procreation, contraception, family relationships, and child rearing and education.' " *Carey v. Population Services International,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977) (citations omitted).

These cases have formed the foundation for arguments that the constitutional right to privacy extends to sexual conduct in intimate relationships between unmarried individuals:

> The argument, then, is this: Marriage exists to facilitate the expression of emotional and sexual intimacy. That intima-

cy is so fundamental to individual liberty that it demands constitutional protection. Nothing is different about the psychological· and emotional needs of unmarried couples which would justify denying them the same protection.

Note, Fornication, Cohabitation and the Constitution, 77 Mich.L.Rev. 252, 291 (1978). Some courts have specifically held that the right of privacy protects sexual freedom. *E.g., State v. Saunders,* 75 N.J. 200, 381 A.2d 333 (1977) (fornication statute violates right of privacy). It has also been held that the off duty-private sexual conduct of public employees is protected by the constitutional right of privacy. *E.g., Shuman v. City of Philadelphia,* 470 F.Supp. 449 (E.D. Pa.1979). Many commentators have argued that the constitutional right of privacy extends to sexual freedom for the unmarried, *e.g.,* Developments in the Law—The Constitution and the Family, 93 Harv.L.Rev. 1156, 1289–1296 (1980), but one recent analysis contends that the Court has given no support to such a notion. Hafen, The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests, 81 Mich.L.Rev. 463, 517–544 (1983).

The similarity between the interests of an unmarried couple in choosing to live together, and the interests in personal privacy and freedom of association previously recognized by the Court as fundamental, was noted by Justice Marshall in his dissent to the denial of certiorari in *Hollenbaugh v. Carnegie Free Library,* 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978). *See* Note, Constitutional Law—A Missed Opportunity for Clarification of the Privacy Right, 4 Western New England Law Review 171 (1981). In particular, J. Marshall referred to the plurality opinion in *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977), holding that "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they

are served by the challenged regulation." *See also* Karst, The Freedom of Intimate Association, 89 Yale Law Journal 624 (1980).

The Supreme Court has observed that it "has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults." *Carey*, 431 U.S. at 694 n. 17, 97 S.Ct. at 2021 n. 17. Justice Rehnquist took issue with that statement, believing that the facial constitutional validity of criminal statutes prohibiting certain consensual acts was established in *Doe v. Commonwealth's Attorney*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976). *Carey*, 431 U.S. at 718 n. 2, 97 S.Ct. at 2033 n. 2. In *Doe* the Court summarily affirmed a three-judge federal court's refusal to declare Virginia's sodomy statute unconstitutional as applied to private consensual homosexual relations. The significance of this summary affirmance has been the subject of much discussion. *See* Note, Constitutional Law—A Missed Opportunity, *supra,* at 181. It certainly seems fair to say that the question has not been "definitively answered."

A good argument can be made that the privacy and associational interests implicated in plaintiff's choice to live with a woman not his wife partake of the fundamental nature of rights which have been held to be "basic values implicit in the concept of ordered liberty." *Griswold,* 381 U.S. at 500, 85 S.Ct. at 1690 (Harlan, J., concurring). The identification of sexual privacy as a fundamental right can proceed from and be limited by its functional analogy to the recognized fundamental right of marital privacy. Marital privacy is fundamental because an examination of the "traditions and [collective] conscience of our people" demonstrate that it is at the core of the venerable and lofty institution of marriage in our society. *Griswold,* 381 U.S. at 486, 85 S.Ct. at 1682 (Goldberg, J., concurring). Once identified as a fundamental right, the scope of marital privacy can be determined by a principled interpretation and analysis of its function. *See* Note, Developments—

The Family, *supra,* at 1177–87. As Justice Powell stated in *Moore,* extending constitutional protection beyond the traditional family, "unless we close our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause, we cannot avoid applying the force and rationale of these precedents to the family choice involved in this case." 431 U.S. at 501, 97 S.Ct. at 1936.

Although an examination of our traditions with respect to sexual privacy yields ambivalent results, *see* Note—Cohabitation, *supra,* at 266–71, 291–93, a consideration of function is arguably more helpful. A right of sexual privacy would afford protection to an informal marriage which serves the same function as a formal marriage in being founded on a relationship characterized by intimacy, voluntary commitment, stability, psychological involvement, and in the heterosexual context, procreative potential. *See* Note, Developments—The Family, *supra,* at 1289–96. It has also been noted that the idea that the intimate relationship, rather than the formal marriage ceremony, is the essence of marriage finds support in the tradition of common-law marriage. *Id.* at 1291.

Without necessarily addressing such arguments, several courts have held that sexual conduct outside marriage is not protected by the First or Fourteenth Amendments. *Baron v. Meloni,* 556 F.Supp. 796 (W.D.N.Y. 1983); *Suddarth v. Slane,* 539 F.Supp. 612 (W.D.Va.1982); *Johnson v. San Jacinto Jr. College,* 498 F.Supp. 555 (S.D.Tex.1980); *Wilson v. Swing,* 463 F.Supp. 555 (M.D.N.C. 1978); *Hollenbaugh v. Carnegie Free Library,* 436 F.Supp. 1328 (W.D.Pa.1977), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978). Others have reached the opposite conclusion. *Baker v. Wade,* 553 F.Supp. 1121 (N.D.Tex.1982); *New York v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (N.Y.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981); *Shuman, supra; State v. Saunders, supra; Smith v. Price,* 446 F.Supp. 828 (M.D.Ga.1977), *rev'd on other grounds,* 616

F.2d 1371 (5th Cir.1980); *Krzyzewski v. Metropolitan Government of Nashville*, 14 E.P.D. ¶ 7725 (E.D.Ill.1977); *Drake v. Covington County Board of Education*, 371 F.Supp. 974 (M.D.Ala.1974); *Fisher v. Snyder*, 346 F.Supp. 396 (D.Neb.1972) aff'd, 476 F.2d 375 (8th Cir.1973); *Mindel v. United States Civil Service Commission*, 312 F.Supp. 485 (N.D.Cal.1970). *See also Fabio v. Civil Service Commission*, 489 Pa. 309, 414 A.2d 82, 9 A.L.R. 4th 600 (Pa.1980).

■ Notwithstanding cases to the contrary, this Court concludes that better logic supports the view which upholds the constitutional right of sexual privacy. Accordingly, the Court is of the opinion that the privacy and associational interests implicated here are sufficiently fundamental to warrant scrutiny of the defendants' acts on more than a minimal rationality basis. *See Smith v. Price*, 616 F.2d 1371, 1375 (5th Cir.1980). *Cf. Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (asserted substantive liberty interest of police officer in matters of personal appearance assumed to be protected by Fourteenth Amendment, but state interests underlying infringing regulation only subjected to rational relation test); *Shawgo v. Spradlin*, 701 F.2d 470 (5th Cir.1983) (finding rational connection between exigencies of Department discipline and police personnel rule forbidding cohabitation among officers).

■ Addressing the government interests involved here, defendants contend that plaintiff's suspension and dismissal were justified because plaintiff's off-duty conduct adversely affected his ability to perform his job. The effect of knowledge of his illegal conduct in the community was likely to be a loss of credibility with the citizens, it is argued. Defendants also introduced evidence designed to show that plaintiff's ability to perform his job was actually affected by his off-duty conduct. This evidence included claims that plaintiff was depressed and saw a psychiatrist, testi-

mony that another officer asked not to be assigned on patrol with plaintiff, and evidence that plaintiff's wife once called the police because she was fearful of a potentially violent confrontation between plaintiff and the ex-husband of plaintiff's cohabitant.

The Court finds unpersuasive the evidence that plaintiff's behavior showed that his off-duty conduct actually had an adverse effect on his ability to perform his job. For example, the reason that plaintiff saw a psychiatrist was that his full-time employer regularly required reviews of employees entrusted with large sums of money. Much of the evidence can be characterized as vague accounts of incidents that may have occurred after plaintiff's suspension. The more difficult issue is whether the likely adverse effect of plaintiff's off-duty conduct on his job performance justified his suspension and dismissal.

Defendants argue that the community's standards would disapprove of plaintiff's conduct, that in such a small community his conduct was or soon would be public knowledge, and that citizens would therefore lose respect for plaintiff in particular and the police force in general. Some courts have indeed emphasized the significant state interest in "the public's perception of law enforcement," *Baron*, 556 F.Supp. at 800–01; in "deterring conduct of employees which is such as to bring the [police department] into disrepute," *Suddarth*, 539 F.Supp. at 618; in "the maintenance of public respect for police officers," *Fabio*, 414 A.2d 82, 9 A.L.R. 4th at 611; and in preventing police officers' conduct which "casts a poor light on the Department as a whole," *Wilson*, 463 F.Supp. at 563.[4]

This Court rejects the notion that an infringement of an important constitutionally protected right is justified simply because of general community disapproval of the protected conduct. The very purpose of constitutional protection of individual liberties is to prevent such majoritarian coer-

---

**4.** *See generally* Annotation, Sexual Misconduct or Irregularity as Amounting to "Conduct Unbecoming an Officer," Justifying Officer's De-

motion or Removal or Suspension From Duty, 9 A.L.R., 4th 614 (1981).

cion. As the *Fabio* court said, "The government must tread lightly when it investigates and regulates the private activities of its employees. Public employers must be careful not to transform anachronistic notions of unacceptable social conduct into law." 414 A.2d 82, 9 A.L.R. 4th at 611–12.

The Court believes that *Shuman* accurately states the better view

[W]e are compelled to conclude that there are many areas of a police officer's private life and sexual behavior which are simply beyond the scope of any reasonable investigation by the Department because of the tenuous relationship between such activity and the officer's performance on the job. In the absence of a showing that a policeman's private, off-duty personal activities have an impact upon his on-the-job performance, we believe that inquiry into those activities violates the constitutionally protected right of privacy.

450 F.Supp. at 459.

Without doubt, the police department has a legitimate interest in the personal sexual activities and living arrangements of its officers where such activities affect their job performance. However, the Court finds from the evidence that the effectiveness of plaintiff had not been impaired at the time of his suspension and subsequent discharge. In fact, the evidence supports the contrary conclusion. The police chief and others all testify that plaintiff was a good officer doing a satisfactory job.

A more troubling argument is made that plaintiff is in violation of a criminal statute which makes unlawful cohabitation of unmarried persons in a "lewd and lascivious" manner.

Since the statute makes lewd and lascivious conduct necessary to be in violation of the statute, it must be determined what these terms mean.

In *Morgan v. City of Detroit*, 389 F.Supp. 922, 929 (E.D.Mich.1975), the Court stated:

Although several Michigan statutes include the word "lewd," *see, e.g.* M.S.A. § 28.567, § 28.571, § 28.575(1), M.C.L.A. §§ 750.335, 750.339, 750.343a, there are no reported Michigan opinions defining the term.

In other jurisdictions the word lewd has been variously defined as meaning lustful, *Shreveport v. Wilson,* 145 La. 906, 83 So. 186 (1919); involving unlawful sexual desire, *Jamison v. State,* 117 Tenn. 58, 94 S.W. 675 (1906); dissolute, *State v. Lawrence,* 19 Neb. 307, 27 N.W. 126 (1886); filthy, *State v. Rose,* 147 La. 243, 84 So. 643 (1920); lascivious, *Shreveport v. Wilson, supra,* lecherous, *State v. Rose, supra;* and libidinous, *Snow v. Witcher,* 31 N.C. 345 (1848).

More recently courts have defined "lewd" as that form of immorality which has relation to sexual impurity or incontinence carried on in a wanton manner, *State v. Prejean,* 216 La. 1072, 45 So.2d 627 (1950); that form of immorality which has relation to sexual impurity, *Slusser v. State,* 155 Tex.Cr.R. 160, 232 S.W.2d 727 (1950); and, in a different sense, as lay, unlearned, unlettered, wicked, lawless, bad, vicious, worthless, base, *State v. Saibold,* 213 La. 415, 34 So.2d 909 (1948).

It is evident that the term "lewd" has no commonly accepted definition. A serious argument could be made that the statute is unconstitutionally vague. However, the plaintiff has not challenged the constitutionality of the statute and the Court need not reach that question. It is not clear that plaintiff has violated the statute. Cohabitating with one who is not one's wife is not, without more, lewd and lascivious conduct. Although plaintiff admits having sexual relations with the woman with whom he was living, there is no evidence that such was in a lewd, lustful, lascivious or licentious manner. There is no evidence that the relationship was open or notorious. There is no evidence that plaintiff appeared at public events or "flaunted" this relationship. It is not sufficient to be unmarried and cohabitate together. In order to violate the statute the activity must be done lewdly and lasciviously.

There is nothing in the record which suggests that the relationship in which the plaintiff was involved had sex as its primary objective.[5] Indeed, the record shows that plaintiff has lived with this woman from the time of his suspension up to the present time. The Court cannot, based upon the evidence, characterize this relationship as "filthy," "libidinous," "wanton," "wicked," "vicious" or "dissolute." In short, the evidence does not support the conclusion that the cohabitation was lewd and lascivious. The Court concludes that there is insufficient evidence indicating that plaintiff is in violation of the statute. Therefore, defendants' argument that they were justified in discharging plaintiff because he was in violation of the statute is without merit.

Finally, a review of the testimony convinces this Court that the evidence relating to plaintiff's job-performance and the argument that he violated the cohabitation and the adultery statutes are pretextual.[6] The Court is of the opinion that the "real" reason for the discharge of plaintiff is that his conduct did not conform with what the defendants perceived to have been the morals of the community. He was discharged because of what defendants anticipated the reaction of the community would be. Even if this is a relevant consideration, there is no evidence as to what, in fact, that reaction was. Constitutional rights should not depend upon popularity polls or the whims of public opinion.

Plaintiff also claims he was subject to disparate treatment, but the evidence did not support his claim. The police chief investigated an allegation that another officer was living in a similar circumstance, but it could not be substantiated. The other officer did not admit cohabitation as plaintiff did, and it was not clear that a joint residence had been established. In another incident of alleged misconduct involving a tire swap, one employee was demoted and the Chief resigned even though it was not clear that any crime had been committed. The Court finds that plaintiff's discharge did not subject him to wrongful disparate treatment.

For the reasons stated, the Court concludes that the discharge of plaintiff from his position as a part-time police officer violated his constitutional rights. Judgment will be entered in favor of plaintiff.

---

**5.** Indeed, even if sex were the primary motive of the cohabitation, there is serious question whether this fact would be relevant. In *People v. Danielac*, 38 Mich.App. 230, 195 N.W.2d 922, the court held sexual intercourse *in the presence of others* did not constitute gross indecency (emphasis added). This is indicative of the present attitude of the Michigan appellate courts towards matters involving sex. Surely, sexual relations in private between unmarried persons is significantly less offensive.

**6.** It should be noted that no efforts were made to prosecute plaintiff as being in violation of either statute.